In re Kenneth H. BERNSTEIN,
Respondent.

A Member of the Bar of the District
of Columbia Court of Appeals.

No. 96–BG–1423.

District of Columbia Court of Appeals.

Argued Nov. 5, 1997.

Decided Jan. 22, 1998.

Kenneth H. Bernstein, respondent, pro se.

Ross T. Dicker, Assistant Bar Counsel, with whom Leonard H. Becker, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Before STEADMAN and REID, Associate Judges, and NEWMAN, Senior Judge.

STEADMAN, Associate Judge:

The Board on Professional Responsibility ("Board") found that respondent Kenneth H. Bernstein, a member of our bar, violated five rules of professional conduct: 1.3(a) (failure to represent a client zealously and diligently), 1.3(c) (failure to act with reasonable promptness in representing a client), 1.4(a) (failure to keep a client reasonably informed about the status of a matter), 1.4(b) (failure to explain the matter to the extent reasonably necessary to permit the client to make informed decisions), and 1.16(d) (failure to surrender papers and property to which the client was entitled). The Board recommends that respondent be suspended from the practice of law for thirty days. We hold that the record supports the Board's conclusions and we adopt the recommended sanction.

## I.

A. *The Facts Underlying the Disciplinary Violations.*[1]

Respondent was admitted to the District of Columbia Bar in May 1975. At all times

---

1. Respondent's brief does not include a statement of facts and provides no citations to the record. *Cf.* D.C.App. R. 28(a)(4), (e) (1997). The following facts are based on the findings of the

relevant to this case, he was a solo practitioner working out of a home office. He had no record of professional discipline for over twenty years, until the complaint was filed in the case sub judice.

### 1. *The Early Representation.*

This case arose from a hit-and-run auto accident that occurred in Virginia in September 1987. Respondent had agreed to represent Kathryn Wheaton and the man who was then her fiance, John Smith, in connection with their claims resulting from the accident.[2] In July 1989, Wheaton and Smith accepted a settlement of approximately $52,000 from Nationwide Insurance Company, whose insured was criminally charged in the accident and pled guilty. Of this $52,000, respondent received one-third as his fee.

### 2. *The State Farm Matter.*

In addition to their claim against Nationwide, Wheaton and Smith hoped to collect $5000 each under Wheaton's own auto insurance policy, which provided coverage up to that amount for medical expenses. Wheaton's insurer, State Farm, had paid over $2000 to her and $637 to Smith, but the company refused to reimburse for further medical expenses because they did not appear to have been incurred as a result of the accident. Wheaton asked respondent to assist them in this regard.

Respondent contacted State Farm as early as October 1987. A series of telephone calls between respondent and a State Farm representative culminated in a July 1988 threat to sue if further medical payments were not made to Wheaton and Smith. Respondent testified that he did not pursue the matter further, however, because State Farm had raised legitimate questions about his clients' pre-existing conditions and whether the accident caused the injuries for which they sought treatment, questions that might have

compromised the more valuable claim against Nationwide.

Yet even after the 1989 settlement with Nationwide, respondent took no further action to pursue the State Farm matter for over three years, until September 1992.[3] He did not contact any representative of State Farm during that time. Without informing Wheaton or Smith, however, respondent filed a complaint on their behalf against State Farm in a West Virginia court on September 3, 1992. Respondent was not admitted to practice law in West Virginia, but he accompanied his complaint with a motion for admission pro hac vice.

State Farm filed a motion to dismiss for improper venue, insufficiency of process, and insufficient service of process, and a motions hearing was scheduled for December 16, 1992. State Farm requested a continuance to allow the parties to pursue informal discovery and attempt to negotiate a settlement. That month, December 1992, State Farm's counsel made a written offer to pay Wheaton and Smith the full amount prayed for. Respondent did not respond to the settlement offer and did not return telephone calls from State Farm's counsel.

### 3. *Respondent's Personal Crises.*

The timing of the settlement offer was inopportune for respondent. In late November 1992, respondent's wife endured a difficult childbirth, which left her bedridden for several months. Respondent offered testimony that from December 1992 until February 1993, his full attention was devoted to caring for his wife and newborn daughter. He was unable to attend to his work and, as a solo practitioner, had not made arrangements for others to cover for his professional duties. His personal problems were compounded by the deterioration of his marriage, which terminated in a divorce and joint custody decree in May 1995.

---

Hearing Committee, as well as our own review of the record.

**2.** It appears from the record that Wheaton and Smith later married and that Wheaton took her husband's name. For clarity, however, this opinion identifies Mrs. Smith by her maiden name.

**3.** During that period, however, respondent represented Smith in an unrelated workers' compensation claim and helped Smith obtain a $30,000 settlement.

In a letter dated March 11, 1993, the attorney for State Farm notified respondent that the settlement offer would be withdrawn if respondent did not respond within three days. Having received no response during that time, State Farm withdrew the offer.

### 4. *Denouement.*

Wheaton tried to reach respondent during the summer and fall of 1993 to discuss the status of the State Farm case, but respondent did not return her calls. Wheaton testified that she spoke with respondent once by telephone during the fall of 1993, and he told her of his continuing marital problems.[4] They did not discuss the State Farm case during that call. Wheaton heard nothing further from respondent and, in April 1994, sent him a letter discharging him as her counsel and requesting her file.

Respondent then informed Wheaton for the first time that he had filed a lawsuit on her behalf some eighteen months earlier. He told Wheaton that he could not pursue the case because he was not authorized to litigate in West Virginia, but that he would not surrender her file unless she signed a release. In June 1994, Wheaton complained to Bar Counsel of respondent's refusal to return her file and his failure to prosecute the State Farm case.

State Farm filed a motion to dismiss the West Virginia case for lack of prosecution in August 1994. Respondent did not file a responsive pleading, but instead filed a motion to withdraw as counsel; his motion for admission pro hac vice had never been granted. The West Virginia court granted State Farm's motion to dismiss, without prejudice to Wheaton's right to refile within one year. Respondent took no further steps in the State Farm matter.

### B. *The Hearing.*

After two days of testimony from respondent, Wheaton, and representatives of State Farm, the Hearing Committee made explicit findings of the above-stated facts and determined that respondent had violated the following three D.C. Rules of Professional Conduct: Rule 1.3(c) (promptness); Rule 1.4(a) (keeping the client informed); and Rule 1.16(d) (surrendering client file).

The Hearing Committee found that respondent did not violate the following four rules, as Bar Counsel had alleged in its complaint: Rule 1.1(a) (competence); Rule 1.3(a) (diligence and zeal); Rule 5.5(a) (unauthorized practice of law, *viz.,* filing the West Virginia complaint when he was not admitted to practice there); and Rule 8.4(c) (dishonesty and misrepresentation). The finding as to Rule 1.3(a) was based on the Hearing Committee's opinion that the charge was "essentially duplicative" of the Rule 1.3(c) violation. The three other findings were based on a lack of evidence. The Hearing Committee report omitted any findings as to the charged violation of Rule 1.4(b) (failing to explain the matter to the client). As to the sanction, the Hearing Committee rejected Bar Counsel's proposal of a sixty-day suspension, recommending instead a public censure.

### C. *The Post–Hearing Proceedings.*

Neither respondent nor Bar Counsel filed exceptions to the report and recommendation of the Hearing Committee. Upon its review of the report and recommendation, the Board substantially adopted the facts found by the hearing committee but, sua sponte, found two additional rules violations and increased the recommended sanction from public censure to thirty-day suspension. The new violations were of Rules 1.3(a) (zeal and diligence), which the Hearing Committee felt was "duplicative" of another charge, and 1.4(b) (failure to explain), which the Hearing Committee had overlooked. Respondent timely noted with us an exception to the Board report and recommendation, pursuant to D.C. Bar R. XI, § 9(e) (1997).

### II.

Respondent takes exception to the Board report because he contends it is not

---

4. Wheaton appears to have been a personal friend of respondent and his former wife, as well as being respondent's client.

supported by the evidence and that the proposed sanction is "unfair and inconsistent."[5]

### A. Review for Substantial Evidence.

#### 1. Whether an Attorney–Client Relationship Existed.

█ Respondent begins with an overarching argument that he cannot be disciplined because he was not acting as an attorney for Wheaton and Smith in their claims against State Farm. He rests this argument on the absence of a written retainer agreement for the State Farm matter, in contrast to the written retainer agreements for his representation of Wheaton and Smith in other matters, as well as the fact that he was never paid for his representation.

█ Respondent's argument is baseless. "It is well established that neither a written agreement nor the payment of fees is necessary to create an attorney-client relationship." *In re Lieber*, 442 A.2d 153, 156 (D.C. 1982); *see also In re Ryan*, 670 A.2d 375, 380 (D.C.1996) ("ethical responsibilities exist independently of contractual rights and duties"). Whether an attorney-client relationship existed is to be determined by the fact finder based on the circumstances of each case. *See Lieber, supra,* 442 A.2d at 156. The record reflects that respondent contacted State Farm on behalf of Wheaton and Smith, that he threatened to sue State Farm if further payments were not made to them, and that he filed a lawsuit on their behalf. Representatives of State Farm, including its West Virginia counsel, directed all their inquiries toward respondent. Wheaton certainly believed respondent was acting as her lawyer, as reflected in her repeated efforts to contact him about the case and her ultimate letter discharging him. *See Lieber, supra,* 442 A.2d at 156 (client's perceptions are important consideration in determining whether attorney-client relationship existed). The Board's conclusion that an attorney-client relationship existed is supported by substantial evidence of record.

#### 2. The Three Violations Found by the Hearing Committee.

Three of the violations found by the Board were also those found by the Hearing Committee. Substantial evidence in the record supports each finding that respondent violated the respective District of Columbia rules of professional responsibility,[6] as follows:

█ *a. Rule 1.3(c) (failing to act with reasonable promptness in representing a client).* The evidence showed that respondent did not resume his contact with representatives of State Farm even after he had secured the favorable Nationwide settlement in July 1989. He delayed filing suit against State Farm until September 1992, over three years later and almost five years after the hit-and-run accident. Finally, he totally failed to respond to State Farm's offer to settle for the full amount available under the policies.

Respondent argues that West Virginia rules of professional responsibility prevented him from pursuing the State Farm matter once he filed suit. Specifically, he claims that West Virginia's rule on unauthorized practice prevented him from acting on the

---

5. Respondent failed to file with the Board any exceptions to the Hearing Committee's report, as he was authorized to do under D.C. Bar R. XI, § 9(b) (1997) and Bd. Prof. Resp. R. 13.2 (1995). Bar Counsel argues that respondent thereby waived any right to challenge the sufficiency of the evidence, citing *In re James*, 452 A.2d 163 (D.C.1982) (failure to challenge before Board alleged lack of notice of charge). We note in passing that the sanction proposed by the Hearing Committee was relatively mild in contrast to that recommended by the Board, that the Board found two additional violations, and that Bar Counsel also took no exception to the Hearing Committee report. We need not decide here the effect of respondent's failure to except to the Hearing Committee's report, since we conclude that the evidence is in fact sufficient. However, unquestionably, an attorney facing disciplinary action should raise before the Board any objections he or she may have to a Hearing Committee report, and fails to do so at the attorney's peril.

6. Respondent suggests that it is the West Virginia rules that are applicable to his conduct as a matter of choice of law. This argument is basically moot since respondent does not demonstrate how the result would be different if we applied West Virginia's version of the Rules of Professional Responsibility rather than our own, other than the unauthorized practice issue discussed *infra*.

case until the West Virginia court decided his motion for admission pro hac vice. However, the possibility that his entry into settlement negotiations might have violated a West Virginia rule does not explain the three-year delay between the Nationwide settlement and his decision to file suit in a West Virginia court. Furthermore, from September 1992, when he filed the motion, until April 1994, when he was discharged by Wheaton, respondent made no effort to request a hearing on the motion or otherwise pursue his admission pro hac vice. If respondent felt that he could not pursue the State Farm case without violating a West Virginia rule governing unauthorized practice, then he should have withdrawn promptly or taken other appropriate steps.

■ *b. Rule 1.4(a) (failing to keep client reasonably informed about the status of the matter).* The evidence showed that respondent did not inform his clients that he had filed a lawsuit on their behalf until eighteen months after it was filed. He did not inform them that State Farm had made a very favorable settlement offer. Respondent did not return his client's telephone calls and other requests for information promptly.

■ *c. Rule 1.16(d) (failing to return the client's papers).* This rule unambiguously requires an attorney to surrender a client's file upon termination of the representation. There is a limited exception, Rule 1.8(i), which allows an attorney to retain his own work product until the client pays for the work. Although respondent does not appear to have been paid for his State Farm services, he cannot rely on the Rule 1.8(i) exception because he refused to surrender *all* documents until his clients signed a general release from liability.[7]

### 3. *The Two Additional Violations Found by the Board.*

■ Besides the three violations found by the Hearing Committee, to which neither

side excepted, the Board sua sponte found that respondent had violated two additional rules. The Board has the authority to do so. If the record supports a finding that more rules were violated than the Hearing Committee concluded, the Board can take such action. *In re Drew,* 693 A.2d 1127 (D.C. 1997) (per curiam). The Board is not limited to the Hearing Committee's "ultimate" findings of fact, *viz.,* whether particular rules were violated. *Id.* at 1132.[8] We turn now to the merits of those additional violations.

■ *a. Rule 1.3(a) (zeal and diligence).* The Hearing Committee was mistaken as to its right to find a violation on this charge. That this charge may be "essentially duplicative" of another is irrelevant. *Drew, supra,* 693 A.2d at 1127. A lawyer violates the requirements of zeal and diligence when he or she fails to communicate with the client and fails to take the necessary steps to preserve the client's interests. *In re Lyles,* 680 A.2d 408 (D.C.1996). A personal crisis does not justify an extended neglect of a pending case. *See In re Dunietz,* 687 A.2d 206, 211–12 (D.C.1996). The Board's finding is supported by evidence that respondent showed scant effort in pursuing the State Farm matter, neglected to keep his clients apprised of its status, and ultimately allowed its dismissal for want of prosecution. These facts betray a lack of zealousness and diligence in pursuing the State Farm case.

■ *b. Rule 1.4(b) (failure to explain matters to client).* The Hearing Committee made no finding whatever as to this alleged violation. It was apparently an omission on the part of the Hearing Committee, and the Board properly revived the issue in its report. *Cf. Drew, supra,* 693 A.2d at 1127 ("we agree with the Board's determination that respondent violated the eight charges that the committee chose not to consider"). The record reflects that respondent did not inform Wheaton and Smith that he had filed the West Virginia suit for eighteen months

---

7. *Cf. Committee on Legal Ethics v. Hazlett,* 179 W.Va. 303, 367 S.E.2d 772 (1988) (under West Virginia version of Rule 1.16(d), lawyer cannot condition the return of a client's file on the execution of a general release).

8. Likewise, we have long recognized the ability of the Board to impose a greater sanction than was recommended by the Hearing Committee, *see, e.g., In re Hines,* 482 A.2d 378, 386 (D.C. 1984), as occurred in this case.

and that he did not inform them of State Farm's settlement offer. Had he explained his progress in the matter, and that an offer to settle the claim in full would of course be superior to litigation, his clients could have instructed respondent to accept the offer. As it was, they never even knew about it.[9]

**B.** *The Appropriateness of the Recommended Sanction.*

Having concluded that the Board's findings are supported by substantial evidence, we now turn to the question of the appropriate sanction. Under our rules, we adopt the Board's recommended sanction "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(g)(1) (1997).

We have imposed suspensions of thirty days and longer for cases of client neglect. *See In re Wright,* 702 A.2d 1251 (D.C.1997) (per curiam) (thirty-day suspension for lawyer who filed case and neglected it for four years); *In re Lewis,* 689 A.2d 561 (D.C.1997) (per curiam) (thirty-day suspension plus requirement to show fitness for reinstatement for neglecting single case; respondent was first-time offender); *In re Dunietz,* 687 A.2d 206 (D.C.1996) (thirty-day suspension for neglect and related ethical violations; sanction stayed pending successful completion of probation); *In re Sumner,* 665 A.2d 986 (D.C. 1995) (per curiam) (thirty-day suspension for neglect, failure to return client papers, and related violations); *see also In re Carr–Kennedy,* 698 A.2d 1021 (D.C.1997) (per curiam) (240 days for client neglect in reciprocal discipline case).

 Several of these cases involved attorneys who, like respondent, did not attend to their clients because they were preoccupied with serious personal problems. *See Carr–Kennedy, supra,* 698 A.2d at 1022 (attorney took refuge in women's shelter and saw marriage deteriorate into divorce); *Lew-*

*is, supra,* 689 A.2d at 563 (combination of plummeting caseload, and "the emotional strain and exhaustion of [a] capital case, left Respondent severely depressed"); *Dunietz, supra,* 687 A.2d at 208–09 (attorney preoccupied with illness of family member). Early in these proceedings respondent expressly waived his opportunity to raise clinical depression as a mitigating factor.[10] *Cf. In re Peek,* 565 A.2d 627, 632–34 (D.C.1989); *Dunietz, supra,* 687 A.2d at 208–09. Moreover, respondent has not demonstrated the other mitigating factors considered in *Dunietz,* such as expressing remorse, voluntarily compensating the client, or merely acknowledging that one has committed misconduct. *See* 687 A.2d at 212. Any alleged depression would not excuse the long delay between July 1989 and December 1992, when respondent testified that his personal problems began. We are quite unable to accept respondent's attack on what he describes as the Board's "moral numbness as regards mitigating circumstances."

We must conclude that the thirty-day suspension recommended in this case is consistent with the discipline imposed in comparable cases and is not otherwise unwarranted.

### III.

For the foregoing reasons, we adopt the recommendation of the Board and order that respondent, Kenneth H. Bernstein, be suspended from the practice of law in the District of Columbia for a period of thirty days. The suspension shall take effect thirty days from the date of this order. We direct respondent's attention to Rule XI, § 14, governing the responsibilities of suspended attorneys.

*So ordered.*

---

9. This rule violation may overlap with Rule 1.4(a) (failure to keep client reasonably informed), but the fact that a charge may be duplicative is irrelevant under *Drew, supra.*

10. Bernstein had filed a "Notice of Intent to Seek Mitigation," but he withdrew the notice

before the hearing began. He offered the following explanation to this court: "I believe my deep depression at that time to have been a normal reaction to terrible events and, therefore, to fall outside the realm of 'mental illness' and 'clinical depression.'"