**In re Alvin Gilbert DOUGLASS, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

No. 03–BG–538.

District of Columbia Court of Appeals.

Argued Sept. 22, 2004.

Decided Oct. 7, 2004.

Joan A. Burt, Crofton, for appellant.

Katherine S. Gruenheck, Of Counsel, with whom Elizabeth J. Branda, Executive Attorney, was on the brief, for the Board on Professional Responsibility.

Traci M. Tait, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for Bar Counsel.

Before SCHWELB and FARRELL, Associate Judges, and NEBEKER, Senior Judge.

PER CURIAM:

An ad hoc hearing committee found by clear and convincing evidence that Alvin Gilbert Douglass, a member of our Bar, had violated Rules 1.1(a),[1] 1.3(a) and (c),[2] 1.8(a),[3] 1.8(g)(1) and (2),[4] and 1.16(d)[5] of the District of Columbia Rules of Professional Conduct. The Committee recommended that Douglass be suspended from practice for 180 days.

1. Rule 1.1. COMPETENCE.
 (a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

2. Rule 1.3. DILIGENCE AND ZEAL.
 (a) A lawyer shall represent a client zealously and diligently within the bounds of the law.
 . . . .
 (c) A lawyer shall act with reasonable promptness in representing a client.

3. Rule 1.8. CONFLICT OF INTEREST: PROHIBITED TRANSACTIONS.
 (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
 (1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
 (2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
 (3) The client consents in writing thereto.

The Board on Professional Responsibility sustained the Hearing Committee's findings as to all charges except those relating to Rule 1.8(g). The Board found, however, that Bar Counsel failed to establish by clear and convincing evidence that Douglass violated either Rule 1.8(g)(1) or Rule 1.8(g)(2). The Board therefore recommended a shorter suspension of 90 days. Both Douglass and Bar Counsel have filed exceptions to the Board's recommendation.

■ We adopt in its entirety the Board's comprehensive and cogently reasoned Report and Recommendation, which is attached hereto and made a part hereof. The sole issue that presents any significant difficulty is whether or not Bar Counsel proved, by clear and convincing evidence, that Douglass violated Rule 1.8(g)(2). As the Board explained, this issue turns on whether Douglass' former client, Mary J. Wilson, was represented by independent counsel when Douglass induced her to sign a General Release protecting him from liability for malpractice. If Mrs. Wilson was not in fact represented by indepen-

dent counsel—and Douglass evidently believed that she was not so represented,[6] and he dealt with her directly, rather than through independent counsel—then his conduct, reprehensible in any event, incontestably contravened Rule 1.8(g)(2). *See* the Board Report at p. 19. For the reasons stated by the Board, *id.* at pp. 20–22, however, "[t]he record is less than clear" that Mrs. Wilson was unrepresented at the relevant time, and the Board reasonably found that Bar Counsel failed to prove lack of representation—an element of a Rule 1.8(g)(2) violation—by clear and convincing evidence, as required by Board Rule 11.5 and by our precedents. *See, e.g., In re Anderson,* 778 A.2d 330, 335 (D.C.2001).

■ We must "accept the findings of the Board unless they are unsupported by substantial evidence of record," D.C. Bar R. XI § 9(g); *In re Kennedy,* 605 A.2d 600, 603 (D.C.1992) (per curiam), and we therefore sustain the Board's determination that no violation of Rule 1.8(g)(2)[7] has been established under the applicable standard of proof. We emphasize, however, as did the Board, that "Rule 1.8(g)(2) makes [it] clear that a lawyer must take great

---

**4.** Rule 1.8(g)(1) and (2). CONFLICT OF INTEREST: PROHIBITED TRANSACTIONS.

(g) A lawyer shall not:
(1) Make an agreement prospectively limiting the lawyer's liability to a client for malpractice; or
(2) Settle a claim for such liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith.

**5.** Rule 1.16. DECLINING OR TERMINATING REPRESENTATION.

(d) In connection with any termination of representation, a lawyer shall take timely steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any ad-

vance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by Rule 1.8(i).

**6.** In a letter dated April 16, 1999, four days before Mrs. Wilson signed the General Release, Douglass wrote: "You stated further that you wanted another attorney, *although you had not currently hired one, but intended to.*" (Emphasis added.)

**7.** We likewise sustain as reasonable the Board's conclusion that Rule 1.8(g)(1), which provides that a lawyer shall not "make an agreement *prospectively* limiting the lawyer's liability to a client for malpractice"(emphasis added),

strongly suggests that the Rule was intended to reach lawyers who insist that clients sign malpractice liability releases at the beginning of the representation, not (as here)

care in attempting to settle a claim for malpractice on behalf of an existing client; he must advise the client, if she is not otherwise represented, that she should seek independent representation on the issue." *See* Board Report at p. 19. By dealing with Mrs. Wilson directly, Douglass acted as if she was not represented by counsel and, although Bar Counsel did not prove lack of representation by clear and convincing evidence, Douglass' conduct in securing the general release was, to say the least, less than commendable.[8]

■ For the foregoing reasons, Alvin Gilbert Douglass is suspended from the practice of law in the District of Columbia for a period of 90 days. Douglass' attention is directed to the requirements of D.C. Bar R. XI §§ 14 and 16, relating to the obligations of suspended attorneys.

■ *So ordered.*[9]

## APPENDIX

## REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of

ALVIN GILBERT DOUGLASS,

Respondent.

> lawyers who insist that they do so at the termination of representation, when the client may already perceive that she has a basis for a malpractice claim.
> Board Report at p. 18.

8. Rule 4.2. COMMUNICATION BETWEEN LAWYER AND OPPOSING PARTIES.
> (a) During the course of representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party known to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so.
> Bar Counsel did not charge Douglass with violating this Rule, and we express no opinion

Bar Docket No. 359–00

## REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

In this case, an Ad Hoc Hearing Committee concluded that Respondent violated a number of disciplinary rules in his representation of Mary J. Wilson in a personal injury claim against Royal Caribbean Cruise Lines. The Hearing Committee concluded that Respondent failed adequately to prepare or pursue Mrs. Wilson's case against the cruise line and then, when Mrs. Wilson discharged him, demanded that Mrs. Wilson release him from liability and confess judgment to liability for attorney's fees as a condition of obtaining her files. The Hearing Committee recommended that Respondent be suspended for 180 days. We sustain some of the Committee's conclusions that Respondent violated disciplinary rules, set aside others, and recommend a suspension of 90 days.

## I. FINDINGS OF FACT

Following are our findings of fact, which, where appropriate, adopt the Hearing

regarding its applicability where a lawyer is, as a practical matter, representing himself.

9. Substantially for the reasons stated by the Board in Part II A of its Report, we discern no merit in any of Mr. Douglass' exceptions to the Board's recommendation. The Hearing Committee did not abuse its discretion in denying Douglass' motion to take Mrs. Wilson's deposition; Douglass did not establish a "compelling need" for such discovery within the meaning of Board Rule 3.2.

At oral argument, counsel for Mr. Douglass attempted to present a number of arguments, accusatory in nature, not addressed in her brief. We need not and do not address these arguments. *In re Shearin,* 764 A.2d 774, 778 (D.C.2000).

Committee's findings, with some modifications and clarifications. These findings of fact are influenced to a considerable extent by the Hearing Committee's express finding, which we accept, that the Wilsons were "credible witnesses in all respects and throughout their testimony." HC Rpt. at 10 ¶ 16.

1. Respondent is a member of the District of Columbia Bar, having been admitted on February 8, 1979, and assigned Bar number 259549. BX A. He is also admitted to practice before the U.S. District Court for the District of Maryland. He is not admitted to practice in the state courts of Maryland and Florida. BX 2 at 1.

2. Mary J. Wilson is an elementary school principal in Maryland. She and her husband, Dr. Clint Wilson, II, a Howard University journalism and communications professor, reside in Maryland. 1 Tr. 20–23, 190–91.

3. During July 28–August 4, 1996, the Wilsons took a cruise aboard a cruise ship operated by Royal Caribbean Cruise Lines. BX C at 12. On August 2, Mrs. Wilson sustained an injury, a burn on her thigh, during a visit to the ship's spa. *Id.* The burn was caused by a faulty electrode, which was connected to a massage machine and attached to Mrs. Wilson's thigh. 1 Tr. 23–24, 192–93.

4. Mrs. Wilson lost no days from work as a result of the burn, and decided not to have surgery. 1 Tr. 97–98. She received antibiotics, pain killers, and a topical ointment on the ship for her burn. 1 Tr. 24–25, 94–95. She also consulted a doctor at Kaiser Permanente in the autumn of 1996. 1 Tr. 95. This consultation did not cost Mrs. Wilson money as it was covered by her employment benefit package. 1 Tr. 99.

5. When the burn did not heal properly, the Wilsons decided to seek legal representation. 1 Tr. 24–25.

6. The Wilsons were referred by an out-of-town friend, Mr. Walker, to speak with Respondent concerning his recommendations for hiring of local counsel. 1 Tr. 25–26. However, Respondent volunteered to handle the case himself. 1 Tr. 26. Respondent and Dr. Wilson are members of the same social fraternity, which meets on a regular basis in the Washington Metropolitan area. 1 Tr. 25–26; 2 Tr. 108.

7. Respondent did not show up for his first scheduled meeting with the Wilsons in late 1996. The Wilsons and Respondent scheduled another meeting. 1 Tr. 26–27, 194.

8. On December 31, 1996 (about five months after Mrs. Wilson's injury), Respondent met with the Wilsons at his office. Respondent agreed to handle Mrs. Wilson's case. 1 Tr. 28, 194–95.

9. On December 31, 1996, the Wilsons and Respondent signed a contingency fee contract, which provided, in pertinent part, that "If no recovery is obtained, no fees shall be payable to the attorney(s) for his/their services unless otherwise agreed to." BX 6 at 2.

10. On December 31, 1996, the Wilsons also signed an "Authorization and Assignment," which authorized the release of Mrs. Wilson's medical records to Respondent, authorized Respondent to pay any medical bills from the proceeds of any recovery, and stated that Mrs. Wilson would ultimately remain personally liable for medical expenses. The Authorization and Assignment also noted the existence of a

three-year statute of limitations on the recovery by a medical provider on any bill for services. BX 6 at 5.

11. Respondent never discussed or explained the meaning of the terms of either his retainer agreement or the Authorization and Assignment with the Wilsons. 1 Tr. 36–40, 197–200. The Wilsons believed that the three-year statute of limitations noted in the Authorization and Assignment pertained to their claim against the cruise line. 1 Tr. 38–39.

12. Respondent never discussed or explained the nature of the case or the value of the case that the Wilsons might have had against the cruise line. 1 Tr. 70–71, 97, 260–61.

13. On January 13, 1997, Respondent asked Mrs. Wilson to facilitate his receipt of her medical records and a witness statement. BX 6 at 12.

14. In February 1997, Respondent forwarded Mrs. Wilson's medical records to Etienne Massac, M.D., a skin injury specialist chosen by Respondent. 1 Tr. 42–43; BX 6 at 12.

15. In March 1997, Dr. Massac examined Mrs. Wilson and issued his report and prognosis opining that surgery could provide a 65% improvement in the scar left by the burn. BX 6 at 21. By letter dated March 25, 1997, Respondent wrote Mrs. Wilson reporting the results of Dr. Massac's examination and stating that "[w]ith the above information from a specialist, I now feel that the facts are at hand to formulate a claim to the cruise line." BX 6 at 60.

16. By letter dated April 25, 1997, Respondent forwarded a copy of Dr. Massac's bill to Mrs. Wilson for payment. BX 6 at 59. Mrs. Wilson and her husband paid the $600 bill after they received it. 1 Tr. 42–43.

17. Respondent took no other substantive action on the Wilson case until June 12, 1997. BX 6 at 16.

18. By letter dated June 12, 1997, Respondent wrote the cruise line to provide a "notice of representation" of Mrs. Wilson in connection with the injury she sustained aboard the ship. This notice did not make a demand for payment or attach any of the relevant medical report or bills. BX 6 at 16.

19. By letter dated June 30, 1997, a risk management adjuster for the cruise line wrote to Respondent acknowledging receipt of his June 12 letter and requesting Respondent to provide to the cruise line, for evaluation "your theory of liability, any medical reports (including diagnosis), itemized receipts, treatments and settlement demand." BX 6 at 58. That letter further stated:

> Our ticket agreement is a legally binding contract. Page two (2), section six (6), of this agreement details promise to bring suit, if at all, only in Miami, Florida, USA. Accordingly, the cruise line will seek to recover damages for attorneys fees expended for breach of this forum selection clause, where suit is filed, if at all, in other than Miami, Florida, as agreed. If you do not possess a copy of our ticket agreement, please advise, and one will be forwarded to you.

*Id.*

20. Respondent never requested a copy of the ticket contract from either the cruise line or the Wilsons. 1 Tr. 148, 170; BX 6 at 54. Respondent never provided Mrs. Wilson's medical records and bills to the cruise line. Respondent never presented a theory of

liability or settlement demand to the cruise line. Other than his "notice of representation" letter of June 12, 1997, Respondent made no further contact with the cruise line on behalf of the Wilsons. BX 6 at 16.

21. The standard of care requires an attorney to conduct research to determine the appropriate statute of limitations and venue for a claim. 2 Tr. 30–31, 40.

22. Respondent did not conduct any research on the applicable statute of limitations until after the Wilsons terminated his legal services. 1 Tr. 57–60, 203–04; 2 Tr. 31.

23. Respondent took no substantive action on Mrs. Wilson's case from June 12, 1997 through February 1998. BX 6.

24. Respondent had all of the information needed to proceed with a claim against the cruise line by August 1997, one year after Mrs. Wilson's injury. When two possible statutes of limitations apply to a claim, the standard of care requires the attorney to file the claim before the lapse of the shorter limitations period. 2 Tr. 99–100.

25. Respondent never discussed with the Wilsons any limitations on his ability to file suit for them in either Florida or Maryland, or any additional costs associated with filing out-of-state and/or in a jurisdiction in which Respondent was not licensed to practice. 1 Tr. 28–30, 35–42, 166, 195–201.

26. Mrs. Wilson periodically attempted to contact Respondent regarding the status of the case. Respondent did not return her phone calls. 1 Tr. 52–53.

27. Dr. Wilson attempted to find out what was happening with the case from Respondent at regular fraternity meetings. 1 Tr. 201–02. Respondent claimed various personal excuses for the inactivity on Mrs. Wilson's case. 1 Tr. 201–02.

28. By letter dated February 18, 1998, Respondent responded to a request by Mrs. Wilson for a status report on her case. BX 6 at 54. In that letter, Respondent told Mrs. Wilson that he would "again write and present our demand argument for damages" and would request "a copy of the basis of its claim in a ticket agreement." *Id.* In fact, during the entire course of the representation, Respondent never sent a demand for payment to the cruise line.

29. From February 18, 1998 through March 1999, Respondent took no substantive action on Mrs. Wilson's claim.

30. By letter dated March 6, 1999, Mrs. Wilson terminated Respondent's services. BX 6 at 6. Before doing so, Mrs. Wilson discussed how to terminate legal services with Dr. Wilson's long-time friend, Mr. Walker. 1 Tr. 104. Mr. Walker advised Mrs. Wilson as to the type of information she should request from Respondent, which included her files and Respondent's determination of venue and any statute of limitations. BX 6 at 6; 1 Tr. 54–57.

31. By letter dated March 17, 1999, Respondent acknowledged receipt of Mrs. Wilson's letter terminating his services and requested until "perhaps near the end of the month" to respond to her inquiries due to "unexpected absences from the office due to circumstances beyond my control." BX 6 at 7.

32. By letter dated April 16, 1999, Respondent wrote to Mrs. Wilson indicating that she must sign two documents in order to obtain her client

file: (a) an "Agreement" confessing judgment of $750.00 owed to Respondent in quantum meruit for his legal services, which would be payable from any recovery on her claim against the cruise line, and (b) a "General Release" from Mrs. Wilson, as Releasor, releasing Respondent, as Releasee, "from all potential claims created by or arising out of the burn on my thigh I received on a sea cruise on/about August 2, 1996 aboard the Royal Caribbean Cruise Line." BX 6 at 3, 25, 26. The letter stated, in pertinent part:

> ... This matter is ripe for a demand letter and negotiations for damages leading to a dollar settlement acceptable to you, or in the alternative, litigation with all its favorable and unfavorable aspects.

> You have rejected allowing me to pursue any further settlement demands.

BX 6 at 3.

33. The Wilsons believed that Mrs. Wilson was required to sign the Agreement and the Release to obtain their client file. 1 Tr. 171, 210.

34. Respondent did not advise the Wilsons to seek the advice of another attorney about his letter or the Agreement and Release that he insisted Mrs. Wilson sign. The Wilsons did not discuss Respondent's letter or documents with any other attorney. 1 Tr. 63, 209–10.

35. Respondent did not fully disclose the terms of the Agreement and the Release to the Wilsons. For example, Respondent did not inform the Wilsons of his hourly rate, the amount of actual hours he had expended on their matter, or the basis for the $750.00 quantum meruit calculation. *See generally* BX 6; 2 Tr. 44; *see also* 1 Tr. 63–64.

36. Respondent did not explain the meaning or content of the Agreement and Release to the Wilsons. 1 Tr. 63–68, 210–13. The Wilsons did not understand some of the terms used in those documents (*e.g.*, quantum meruit). They did not understand the purpose of the "General Release." *Id.*

37. Mrs. Wilson signed both the Agreement and the Release at Respondent's office on April 20, 1999. 1 Tr. 68, 70.

38. After receiving her file from Respondent, Mrs. Wilson contacted Mr. Walker and asked him to look into her case. Mr. Walker quickly investigated the questions of proper venue and statutes of limitations, called the cruise line, and concluded that a one-year statute of limitations governing injuries on the high seas applied to Mrs. Wilson's claim and had expired. 1 Tr. 71, 137–38.

39. Mrs. Wilson, represented by Mr. Walker, subsequently made a claim against Respondent for malpractice, which Respondent settled out of court for $4000. 1 Tr. 74.

40. While she was pursuing a money claim from Respondent, Mrs. Wilson filed a complaint with Bar Counsel claiming ineffective representation by Respondent. Although Mrs. Wilson was willing to drop the complaint when Respondent settled her case, Bar Counsel continued to pursue the matter. Mrs. Wilson cooperated with Bar Counsel because she believed that the public should be protected against Respondent. 1 Tr. 76–77.

41. Respondent's client file for Mrs. Wilson contains property, reports, and bills owed by the Wilsons, *i.e.*, material that is clearly not attorney work

product. *E.g.*, BX 6 at 2–8, 10–15, 17–27.

42. Respondent is active in the community and well regarded by his professional colleagues as ethical and trustworthy. 2 Tr. 116–20.

43. In 1996 and 1997, Respondent organized and produced seminars in professional ethics for the National Bar Association ("NBA"). He received an award from the NBA for his efforts. 2 Tr. 120, 124; 1 Tr. 141.

44. On August 4, 1994, Respondent was informally admonished for a violation of Rule 1.5(b). BX 7.

45. On September 13, 1995, Respondent was informally admonished for violations of Rules 1.1(a), 1.3(a), 1.3(c), 1.4(a) and 1.16(a)(2). BX 8.

46. On February 3, 2000, the District of Columbia Court of Appeals publicly censured Respondent for violations of Rules 1.1(a), 1.1(b), 1.2(a), 1.3(a) and 1.3(c). BX 9.

## II. ANALYSIS

### A. *Procedural Matters*

Before proceeding to the merits of the charges against Respondent, we consider various arguments that Respondent has made contesting the procedural regularity of the proceedings in this case. We find that only three warrant discussion.

■ First, Respondent has argued that the Ad Hoc Hearing Committee that heard this matter was not properly constituted in accordance with the Board's Rules and with the Court's Rule XI. We disagree. Neither set of Rules precludes the convening of an Ad Hoc Committee if, for some reason, one of the standing hearing committees cannot hear the case in a timely fashion, or at all. As the Chair of the Committee noted in its October 4, 2002 order, "[a]ll that Section 5(a) [of Rule XI] requires is that each Hearing Committee appointed by the Board . . . shall consist of two members of the Bar and one person who is not a lawyer. The Ad Hoc Hearing Committee appointed in this matter satisfies this requirement." The Board has found over time that, because of great demands on the time of both lawyer and nonlawyer members in our volunteer disciplinary system, Ad Hoc Committees are at times necessary to ensure that the disciplinary process operates without undue delay—which could harm the interests of Bar Counsel, the attorneys involved, and the public.

■ Second, Respondent objects to the Hearing Committee's reliance on the testimony of Maurice Burstein, who testified for Bar Counsel as an expert on personal injury practice in the District of Columbia and Maryland. The essence of Mr. Burstein's testimony was that Respondent did not take the necessary steps that a reasonable attorney handling a personal-injury case like Mrs. Wilson's would have taken to prepare and prosecute the case, such as fully investigating the facts of the case, discussing the nature of the case with the client, explaining various documents to the clients, contacting the opposing party promptly, documenting the medical record with an eye to saving expenses for the client, following up on letters from the opposing party, and presenting a demand for damages to the opposing party. *See* 2 Tr. 12–27.

Respondent centrally argues that Mr. Burstein's testimony should be discounted because Mrs. Wilson's case would likely have been brought in court as a case arising under federal maritime law, and Mr. Burstein was not, and did not purport to

be, an expert in maritime law.[1] Respondent argues in particular that Mr. Burstein's testimony was based on the assumption that Respondent would have only one year in which to bring Mrs. Wilson's case, whereas in fact (Respondent maintains) he might have had at least three years under maritime law to bring the case. This argument is wide of the mark. The bulk of Mr. Burstein's testimony did not concern steps that Respondent should have taken in order to meet the statute of limitations, although Mr. Burstein did observe—correctly, in our judgment—that if there is a question as to which statute of limitations governs, a reasonable attorney should institute the action within the shortest period that might be thought applicable. *See* 2 Tr. 100–02. Rather, Mr. Burstein's testimony went to steps that should be taken in *any* personal injury action, regardless of the venue, and his testimony seems to us entirely sensible. For example, it is surely the case that an attorney handling a personal injury matter has the obligation to discuss the basic nature and value of the case with his client, whether it is brought under state or federal maritime law. And if, as Mr. Burstein testified, a reasonable attorney should counsel his personal-injury client about various options to be explored concerning medical testimony, rather than simply referring her to a single doctor, it can hardly matter whether the case is state or federal in nature. Finally, even if a somewhat remote statute of limitations might be thought to govern a case, surely an attor-

ney adhering to the proper standard of care will take reasonably expeditious steps to pursue his client's case, in order to preserve evidence, to secure prompt recovery, and to guard against the possibility of bankruptcy or disappearance of the defendant. We, therefore, find the Burstein testimony properly admitted as expert testimony.

■ Finally, Respondent argues that the Assistant Bar Counsel engaged in prosecutorial misconduct when, after the Committee had completed its hearing of the evidence on whether Respondent had committed a violation of the disciplinary rules and had issued its preliminary, non-binding determination that some charges had been proven, she disclosed to the Hearing Committee that Respondent had prior discipline and cross-examined a character witness with that evidence of prior discipline. We fail to see that any prosecutorial misconduct occurred. Assistant Bar Counsel adhered scrupulously to the Board's Rules. Only after the Hearing Committee closed its hearing on the merits of the case and proceeded to the question of sanction did she disclose the existence of prior discipline, which is of course directly relevant to the question of sanction. *See* Board R. 11.10. Moreover, Rule XI and the Board's Rules have always allowed confidential discipline (such as informal admonitions, under our pre–1995 practice) to be disclosed in such a setting. *See* D.C. Bar R. XI § 23 (1978) (now § 17(c)(2) and (3)); *see also* Board R. Ch. 9, ¶ 4 (1978)

---

1. Respondent also argues that she was not given the opportunity to voir dire the expert, and that the Hearing Committee did not properly find that Mr. Burstein was qualified to testify as an expert. The Hearing Committee handled the admissibility of Mr. Burstein's testimony properly. The Committee heard the testimony, as provided for in Board Rule 7.14(a), and then recommended to this Board that the testimony be accepted as expert testimony. Respondent was provided ample opportunity to cross-examine Mr. Burt on both his qualifications and the substance of his testimony, and took advantage of that opportunity at the hearing.

(now Board R. 6.6 (2002)); Board R. Ch. 8, ¶ 4(2) (1978) (now Board R. 11.10 (2002)).

 It is true that in this case, the Hearing Committee was unable to reach a preliminary nonbinding determination whether *all* of the charges proffered by Bar Counsel had been proven. *See* 2 Tr. 143. The Board's Rules, however, do not preclude the Hearing Committee from taking evidence in mitigation and aggravation, including evidence of prior discipline, at that time even if it has not reached such a determination as to some or all of the charges proffered. Rather, Rule 11.10 provides:

> In all cases in which the Hearing Committee is able to reach such a preliminary, non-binding determination, the Hearing Committee shall immediately resume the hearing and permit Bar Counsel to present evidence of prior discipline, if any. Respondent shall be permitted to present any additional evidence in mitigation. In those extraordinary cases where the Hearing Committee is unable to reach such a preliminary determination, the Hearing Committee Chair *may* defer the presentation of matters in aggravation (including prior discipline) and in mitigation until such later time as the Hearing Committee Chair shall designate for the presentation of such evidence in documentary form or at a subsequent hearing which the Hearing Committee Chair may authorize on a showing of good cause.

(Emphasis added.) As the Rules' use of the word "may" indicates, whether to defer the reception of aggravating and mitigating evidence in a case where the Hearing Committee has not reached a preliminary determination on all charges proffered is remitted to the Hearing Committee's

sound discretion. That discretion was not abused in this case.

**B. *Violations of Rules 1.1(a), 1.1(b), 1.3(a), and 1.3(c)***

 The Hearing Committee concluded that Respondent violated Rules 1.1(a), 1.1(b), 1.3(a), and 1.3(c), which in turn require lawyers to provide competent representation to clients, to serve clients with the appropriate skill and care commensurate to the matter, to represent clients zealously and diligently within the bounds of the law, and to act with reasonable promptness in representing a client. We agree that these Rules were violated.

The record establishes by clear and convincing evidence that Respondent did not take action to prosecute the Wilsons' potential claim against the cruise line, but rather allowed it to languish for an extraordinary period of time, almost two years. First, as the Hearing Committee and we have found, Respondent never explained his contingency fee agreement or the basic nature of the case to the Wilsons. These obligations are fundamental aspects of the attorney's standard of care to the client and, as Bar Counsel's expert testified, are generally adhered to by attorneys representing clients in personal injury matters. Second, Respondent failed to discuss with Mr. Wilson alternatives regarding medical providers and medical treatment. Third, after the cruise line wrote to Respondent asking for his theory of liability and settlement demand, informing him of its position that any case would have to brought in Florida, and offering Respondent a copy of the ticket agreement in support of its position that Florida was the only permissible venue, Respondent failed to follow up in any meaningful way. Respondent never provided his theory of liability or settlement demand, and never asked for the ticket agreement even though that would seem to be a crucial

piece of evidence in the case. Fourth, Respondent did not research the applicable statute of limitations. These are all serious failings in Respondent's preparation of the case and, taken together, amount to a violation of Rules 1.1(a) and 1.1(b).

In addition, the evidence, taken as a whole, demonstrates by clear and convincing evidence that Respondent neglected this matter and failed to act with zealousness and diligence in pursuing it, in violation of Rules 1.3(a) and 1.3(c). The record demonstrates that Respondent essentially stopped active work on the case as of June 12, 1997, even though by that time he had enough information to proceed on a case. Except for a brief period of activity in February 1998, when Respondent responded to Mrs. Wilson's inquiries, Respondent again took essentially no action on the case through March 1999, when Mrs. Wilson terminated Respondent as her lawyer. Nothing in the record suggests that Respondent has a reasonable explanation for his failure to bring the matter to a head by failing a lawsuit or, at the least, presenting the cruise line with a written demand for damages.

Like the Hearing Committee, we are not persuaded by Respondent's argument that Mrs. Wilson had at least three years in which to bring her claim against the cruise line, on the assumption that a special federal maritime statute of limitations applied to the case. Even if that is correct (a point we need not decide), the fact remains that Respondent took no action on the case for about 21 months. Respondent's failure to attend to this case is not excused by the possibility that an action against the cruise line still might have been timely. The question in this case is not whether Mrs. Wilson was financially injured through the loss of a cause of

action by Respondent's inattention, which would be a central issue in an action for legal malpractice. Rather, the question is whether, *even if* (as Respondent contends) a somewhat remote statute of limitations was applicable, a reasonable attorney would have allowed almost two years to pass without performing any work on this case. The expert testimony presented by Bar Counsel—which we, like the Hearing Committee, find persuasive—amply establishes that a reasonable attorney would not do so. That point is confirmed by common sense. Delay in prosecuting a personal injury case is almost always dangerous to the plaintiff: memories can fade, evidence can be destroyed, favorable witnesses can disappear, and defendants can file for bankruptcy. Of course, the Rules (unlike statutes of limitations) do not require that every personal injury claim must be brought within a particular time, and the lawyer is entitled to exercise judgment in balancing the need for thorough preparation against the need for expedition. But the record in this case does not suggest that Respondent delayed filing the lawsuit because he was busy preparing the case. Rather, it establishes that he neither filed nor prepared the case, and almost two years of sustained inattention crosses the line to incompetence and neglect.

### C. *Violations of Rules 1.8(a) and 1.8(g)*

These charges arise out of Respondent's attempt to insulate himself from a malpractice action by Mrs. Wilson, and to ensure that she paid him attorney's fees for the work he claimed to have done before he was discharged. As our Findings of Fact establish, after Mrs. Wilson indicated her intent to discharge Respondent, Respondent informed her that she would have to sign a note confessing judgment to Respondent in the amount of $750 for his legal services, as well as a release

shielding him from all potential claims arising out of the injuries she suffered on the cruise. Respondent did not advise the Wilsons to seek the advice of another attorney about the confession note and the release, and also did not fully disclose the terms of either of those documents to the Wilsons. For example, Respondent did not inform the Wilsons of his hourly rate, the amount of actual hours he had expended on their matter, or the basis for the $750 quantum meruit calculation for the confession note. Nor did Respondent explain technical legal terms in the documents (such as "quantum meruit") to the Wilsons. The Hearing Committee found that Rules 1.8(a), 1.8(g)(1), and 1.8(g)(2) were violated by this conduct. We agree only with the conclusion that Rule 1.8(a) was violated.

1. Rule 1.8(a) provides:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transactions; and

(3) the client consents in writing thereto.

The crucial question on the Rule 1.8(a) charge is whether either the release or the confession note that Respondent required that the Wilsons sign constituted a "business transaction with a client" or "an own-

ership, possessory, security, or other pecuniary interest adverse to a client" within the meaning of the Rule. The Hearing Committee assumed that both the release and the note fell within the meaning of those terms, and concluded based on that assumption that Respondent's conduct as to both violated Rule 1.8(a). We are less certain about the release, but we agree that the note so qualified. A note that requires a client to pay money to a former lawyer out of any settlement funds that the client obtains (through another lawyer's efforts or through her own) is quite naturally understood as a "pecuniary interest" acquired by the former lawyer which is "adverse" to the interests of the client. Should Mrs. Wilson have recovered from the cruise line and then declined to pay Respondent, Respondent could have proceeded in court against her to recover on the note. The Hearing Committee's report fully demonstrates that Respondent's conduct in securing Mrs. Wilson's agreement to this note did not comply with Rule 1.8(a), because at a minimum he did not adequately explain the transaction and the terms on which he acquired the pecuniary interest that was adverse to her own interests.

2. Rule 1.8(g) provides:

(g) A lawyer shall not:

(1) make an agreement prospectively limiting the lawyer's liability to a client for malpractice; or

(2) settle a claim for such liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith.

 There is a paucity of case law on Rule 1.8(g), but we think that the release at issue here is properly analyzed under

Rule 1.8(g)(2), rather than Rule 1.8(g)(1).[2] The key word in Rule 1.8(g)(1) is "prospectively." The release signed by Mrs. Wilson was not intended to *prospectively* limit Respondent's malpractice liability to her, within the meaning of Rule 1.8(g). Rather, the term "prospectively" as used in Rule 1.8(g)(1) strongly suggests that the Rule was intended to reach lawyers who insist that clients sign malpractice liability releases at the beginning of the representation, not (as here) lawyers who insist that they do so at the termination of representation, when the client may already perceive that she has a basis for a malpractice claim. That situation falls more naturally within Rule 1.8(g)(2), which addresses the situation where the lawyer attempts to settle an actually existing *claim* (even a claim that has not been filed in court) for malpractice liability.[3]

Rule 1.8(g)(1) flatly prohibits a lawyer from attempting to limit his malpractice liability to a client for services to be rendered in the future. It does not flatly prohibit a lawyer from attempting to pre-vent a client from suing him in connection with services already provided, for which the client might already have a claim for malpractice. Rather, Rule 1.8(g)(2) makes clear that a lawyer must take great care in attempting to settle a claim for malpractice on behalf of an existing client; he must advise the client, if she is not otherwise represented, that she should seek independent representation on the issue.

Whether Respondent violated Rule 1.8(g)(2) turns fundamentally on whether Mrs. Wilson was "represented" (by someone other than Respondent) at the time that Respondent insisted that she sign the release. The Rule reaches only lawyers who settle a claim for malpractice liability with an "unrepresented client or former client." Thus, as Bar Counsel acknowledges, if Mrs. Wilson was represented by another lawyer on the matter of a potential malpractice claim against Respondent when she signed the release, the Rule would not have been violated. Bar Counsel also acknowledges that, as the client's lack of representation is an ele-

---

**2.** We have not found any original cases from this jurisdiction discussing Rule 1.8(g). We are aware of only a reciprocal case involving Rule 1.8(g), namely *In re Kirkiles*, 779 A.2d 357 (D.C.2001). In *Kirkiles*, the Court and the Board concluded that Kirkiles had committed misconduct sanctionable in the District of Columbia when he refused to release his clients' files until they signed an agreement holding harmless based on his representation of them. We noted that Kirkiles' conduct violated Rule 1.8(g), but we did not state which prong of Rule 1.8(g) was implicated, nor did we address the language of that Rule.

**3.** Our analysis of Rule 1.8(g) is supported by ABA Model Rule 1.8(h), which provides: "A lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement, or settle a claim for such liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith." Commentators have read ABA Model Rule 1.8(h) as setting forth two distinct rules, analogous to our Rules 1.8(g)(1) and 1.8(g)(2). ABA Model Rule 1.8(h) divides "the prohibition against limiting liability into two distinct time periods. The first is when a lawyer accepts representation of a client, but conditions the representation upon the client's *prospectively* releasing the attorney from any potential claim for malpractice in the case. The second is when the attorney, in his representation of the client, commits malpractice and then seeks to settle the matter and obtain a release from the client who is unrepresented." *See* ABA/BNA Lawyers' Manual on Professional Conduct § 51:1103–107 (1999) (emphasis added). Prospective agreements are "limitation of liability agreements undertaken at the *outset* of the representation." *Id.* (emphasis added).

 

ment of the disciplinary violation, Bar Counsel must prove by clear and convincing evidence that a client was *not* represented when she settles a malpractice claim. Thus, the record must clearly establish lack of representation.[4]

After a thorough review of the record, we are unable to find clear and convincing evidence that Mrs. Wilson was *not* represented by another lawyer when she signed the release. The record is too murky on this issue to allow us to so conclude with confidence. Respondent argues that, even before Mrs. Wilson terminated his services, she had consulted with an attorney friend, Mr. Walker, about how to go about terminating Respondent's services. It is undisputed that, before Mrs. Wilson terminated Respondent (and, therefore, before she signed the release), she sought the advice of Mr. Walker about how she should fire Respondent. The key question is whether Mrs. Wilson was seeking Mr. Walker's advice as a social friend who happened to be an attorney, or whether she was consulting him as her attorney. Bar Counsel bears the burden of proof on this issue, and has not carried it. The

record is less than clear, and Respondent is entitled to the benefit of the ambiguity.

Mrs. Wilson's testimony on direct examination does not establish whether, at the pertinent time, she was consulting Mr. Walker as a friend or as her attorney.[5] She testified that "my husband and I called Mr. Wallace Walker, my husband's friend, for advice because the statute [of limitations] would have been expiring in, I'd say, six months. So he said, well—we asked for the advice and then, of course, I relieved [Respondent] of his duties." 1 Tr. 54.

On cross examination by Respondent's counsel, the matter was not clarified. In particular, we note that the Hearing Committee Chair specifically ruled that, when Mrs. Wilson consulted Mr. Walker on the issue of how to terminate Respondent, she *was* consulting Mr. Walker in his capacity as her attorney (even though she had no formal letter of representation from him at the time), and the Chair cautioned Mrs. Wilson that she was entitled to claim the attorney-client privilege on the substance of her conversations with Mr. Walker on that issue. *See* 1 Tr. 104–08; *see also* 1

4. The Rule does not make clear how closely related the subject of the client's representation by another lawyer must be to the liability release at issue, but it is likely that a rule of reason governs. If a client were represented by another attorney with respect to a totally unrelated matter, that point would not excuse her initial lawyer's failure to comply with Rule 1.8(g)(2). Thus, for example, if Mrs. Wilson had been represented by another lawyer with respect to real estate or immigration matters when she terminated Respondent's services and signed the release, that point would not establish that she was "represented" by another attorney within the meaning of the Rule. On the other hand, we do not read the Rule to require that the client must be represented by another attorney specifically with regard to the liability release. In this case, as noted below, we must assume (for the record does not establish clearly and convinc-

ingly to the contrary) that Mrs. Wilson was represented by Mr. Walker with respect to the general matter of her termination of Respondent's legal services. That general subject matter is closely related to the issue of the liability release. Although Respondent was apparently not aware at the time that Mrs. Wilson had consulted with another lawyer, if he had known that she had sought legal advice elsewhere about how to terminate his services, he would have been entitled to conclude that the subject matter of that legal advice included a liability release.

5. It is clear that *subsequent* to her discharge of Respondent, Mrs. Wilson employed Mr. Walker as her attorney in resolving her dispute with Respondent. *See* 1 Tr. 67 (Mrs. Wilson testifying that Respondent contacted her through Mr. Walker).

Tr. 113–14 (Chair ruling that Mrs. Wilson had likely waived her privilege). Whether or not that decision was correct, it clearly cut off further development of the record on the question whether Mrs. Wilson was "represented" by Mr. Walker at the time she terminated Respondent.

Moreover, what is in the record on cross examination tips the balance away from Bar Counsel. Mrs. Wilson testified that "she spoke with Mr. Walker" just before sending the termination letter to Respondent, and that Mr. Walker "told us the things that we should request" in that letter. 1 Tr. 103–04. It is possible that Mr. Walker was simply providing advice to Mrs. Wilson as a social friend—her testimony could be read either way on that point—but the Hearing Committee Chair immediately then ruled that Mrs. Wilson and Mr. Walker had an attorney client relationship at that time. Bar Counsel did object, at that very point, that it was uncertain that the record reflected that "Mr. Walker was representing Mrs. Wilson at this time." 1 Tr. 107. The Hearing Committee Chair then noted that there was "no formal representation" by Mr. Walker of Mrs. Wilson at that time, but nonetheless reconfirmed the earlier ruling that an attorney-client relationship had been established, 1 Tr. 107, 108. Bar Counsel did not press the point further and withdrew her objection. *Id.* Thus, Bar Counsel was unable to prove that Mr. Walker did not represent Mrs. Wilson at the crucial time. Because of that failure of proof no violation of Rule 1.8(g)(2) has been made out.

### D. *Violation of Rule 1.16(d)*

Finally, the Hearing Committee concluded that Respondent had violated Rule 1.16(d) when, after the Wilsons terminated his services, he refused to return the Wilsons' file to them unless they agreed to sign the release and confession note. We agree with this determination. Rule 1.16(d) provides:

In connection with any termination of representation, a lawyer shall take timely steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, *surrendering papers and property to which the client is entitled,* and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by Rule 1.8(i). (emphasis added)

Respondent violated this Rule by refusing to surrender to the Wilsons their papers and property to which they were entitled, such as Dr. Massac's medical reports. He was not entitled to maintain, in effect, a lien over these papers in order to secure his clients' signature to the release and confession note, just as he would not have been entitled to maintain a lien to secure their payment of his fees. *See In re Bernstein,* 707 A.2d 371, 376 (D.C.1998); *In re Ford,* 797 A.2d 1231 (D.C.2002).

Nor can Respondent find shelter in the Rule's safe harbor that a lawyer may retain papers "relating to the client to the extent permitted by Rule 1.8(i)." *See* R. 1.16(d). Rule 1.8(i) provides that a lawyer "shall not impose a lien upon any part of a client's files, *except* upon the lawyer's own work product, and then only to the extent that the work product has not been paid for." Rule 1.8(i) thus "is in the nature of a defense to a Rule 1.16 violation. A lawyer can explain his failure to surrender papers in a timely fashion by arguing that he has asserted a lien under Rule 1.8(i)." *See In re Ford,* Bar Docket No. 24–98, at 9; *In re Confidential,* Bar Docket No. 389–91, at 13 (BPR June 15, 1995). But Rule 1.8(i) does not avail Respondent here, because he ef-

 

fectively asserted a lien over far more than his own work product (to the extent there was any) in the Wilsons' file.

### III. SANCTION

Bar Counsel recommended a sanction of 90 days' suspension to the Hearing Committee. The Hearing Committee found that recommendation to be insufficient, and instead recommended that Respondent be suspended for 180 days. That recommendation, however, was based in part on the Committee's determination that Respondent had violated Rule 1.8(g), a conclusion with which we do not agree. Without that violation we conclude that 90 days' suspension is an appropriate sanction for Respondent's neglect and lack of competent handling of the Wilsons' case, conflict of interest, and improper refusal to return client files, in light of the fact that Respondent has prior discipline.

This case bears some resemblance to *In re Bernstein,* 707 A.2d at 376, where the Court ordered a suspension of 30 days. Like this case, *In re Bernstein* involved an attorney who neglected client matters and then refused to surrender the client's file until she executed a release from liability. Indeed, in some aspects, the conduct in *In re Bernstein* was worse than in this case: the neglect of the client's matter lasted longer, and the attorney actually filed a lawsuit on behalf of the client without informing the client or securing her consent, in a jurisdiction where the lawyer was not admitted to practice.

Nonetheless, we conclude that a somewhat longer suspension is warranted here for several reasons. First, the conflict of interest in this case, which violated Rule 1.8, makes the case more serious than *In re Bernstein.* In *Bernstein,* the attorney insisted that the client sign a release of malpractice liability. Respondent not only did that but also insisted that his client sign a note confessing her own liability to him for attorney's fees. This action by Respondent placed his client in a directly adverse position to his own, and, as noted above, was not accompanied by the necessary disclosures.

A wide range of sanctions is applicable for conflict situations, from public censure to one year's suspension. *See In re McLain,* 671 A.2d 951, 954 (D.C.1996). On balance, we think that the conflict in this case is not appreciably worse than the conflict in *In re McLain,* which involved a much greater sum of money; the attorney in that case was suspended for 90 days. *See id.; see also In re Shay,* 756 A.2d 465 (D.C.2000) (90–day suspension for conflict of interest in estate planning matter).

There are no significant mitigating circumstances in this case. As Bar Counsel observes, there are aggravating circumstances present, in that Respondent has previously been informally admonished and publicly censured on a number of occasions, essentially for neglecting other client matters. This prior discipline does aggravate the incompetence and neglect violations in this case, since it indicates that Respondent has not internalized the obligation to pursue client matters with the appropriate promptness, preparation, diligence, and zeal. On the other hand, we do not think the prior discipline additionally aggravates the conflict of interest violation in this case, for those earlier matters did not involve conflicts. Thus, our recommendation is that Respondent should be suspended for 90 days.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: Paul R.Q. Wolfson, Member

Dated: May 30, 2003

All Members of the Board join this report and recommendation except Dr. PAYNE,

who is recused, and Mr. KNIGHT and Mr. BAACH, who did not participate.