*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-BG-1017

IN RE NATHANIEL H. SPEIGHTS, RESPONDENT.

FILED **11/22/2017**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

A Member of the Bar of the District of Columbia Court of Appeals
(Bar Registration No. 952036)

On Report and Recommendation
Of the Board on Professional Responsibility
(BDN-48-10)
(Board Docket No. 12-BD-017)

(Argued September 14, 2017                    Decided  November 22, 2017)

*David A. Carr* for respondent.

*Hamilton P. Fox, III*, Assistant Disciplinary Counsel, with whom *Wallace E. Shipp, Jr.*, Disciplinary Counsel at the time the brief was filed, and *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before GLICKMAN, EASTERLY, and MCLEESE, *Associate Judges*.

PER CURIAM:  Respondent Nathaniel H. Speights takes exception to the appended report and recommendation of the Board on Professional Responsibility. The Board adopts the findings and conclusions of its Ad Hoc Hearing Committee that respondent mishandled and neglected a personal injury action he filed in the United States District Court in the Middle District of Pennsylvania on behalf of a

client who sustained severe injuries in a downhill skiing race accident. Agreeing with the Hearing Committee's determination that respondent's errors and omissions clearly and convincingly demonstrate his violation of D.C. Rules of Professional Conduct 1.1 (a) (failure to provide competent representation), 1.1 (b) (failure to serve a client with skill and care commensurate with that generally afforded by other lawyers in similar matters), 1.3 (a) (failure to represent his client zealously and diligently), and 1.3 (c) (failure to act with reasonable promptness in representing his client), the Board recommends that respondent be suspended from the practice of law in the District of Columbia for six months.

In considering respondent's objections to the report before us, we review *de novo* the Board's legal conclusions and other legal questions,[1] but we defer to the factual findings of the Hearing Committee and the Board "unless they are unsupported by substantial evidence" in the record, and we "shall adopt" the Board's recommended disposition "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be

---

[1] *In re Vohra*, 68 A.3d 766, 769 (D.C. 2013); *In re Martin*, 67 A.3d 1032, 1039 (D.C. 2013).

unwarranted."[2] For the reasons that follow, we conclude that respondent's exceptions lack merit and impose the sanction that the Board recommends.

First, although respondent contends that his rule violations were not established by the requisite clear and convincing evidence,[3] Disciplinary Counsel in fact presented overwhelming proof of respondent's neglectful and incompetent representation of his personal injury client throughout the course of his multi-year engagement. Respondent's errors and omissions, as found by the Hearing Committee and detailed in its report appended to this opinion, included (but were not limited to) suing the wrong defendants; failing to amend the complaint to name the proper defendants after they became known to him; failing to conduct discovery or to investigate the accident; failing to prepare his client for his deposition; failing to take steps to preserve evidence; failing to request an extension of time to produce an essential expert's report; and repeatedly violating local court rules, required pretrial procedures, and court orders. As the Committee report also notes, the federal courts contemporaneously castigated respondent for

---

[2] D.C. Bar R. XI, § 9 (h)(1); *see also In re Pierson*, 690 A.2d 941, 946-48 (D.C. 1997).

[3] *See, e.g.*, *In re Mitchell*, 727 A.2d 308, 313 (D.C. 1999) ("It is [Disciplinary] Counsel's burden to establish by clear and convincing evidence that respondent violated the Rules of Professional Conduct.").

neglecting the case and violating court orders and rules. Respondent's conduct exposed his client as well as himself to the threat of sanctions and ultimately led the district court to enter judgment for the defendants. Moreover, the Hearing Committee found respondent's explanations for his actions unworthy of credence. We are satisfied that the Committee readily could find that Disciplinary Counsel established respondent's Rule violations by clear and convincing evidence.[4]

Respondent's second objection focuses on the Board's statement in its report that it "concurs with the Hearing Committee's factual findings as supported by substantial evidence in the record." He argues that the Board, like the Hearing Committee, was required to find his Rule violations to have been proved by clear and convincing evidence. This is not correct, however. "Clear and convincing evidence" is the standard of proof for the finder of fact to employ in a disciplinary proceeding; but as Board Rule 13.7 states, "[w]hen reviewing the findings of a Hearing Committee, the Board shall employ [the] 'substantial evidence on the record as a whole' test." Rule 13.7 requires the Board to employ the "clear and

---

[4] Respondent also objects to the Board's failure to determine whether "any one" of the failings identified by the Committee would have sufficed "by itself" to prove a Rule violation. The Board did not need to make such a determination, however, because it concluded, as did the Hearing Committee, that respondent committed the charged Rule violations based on "the entire course" of his conduct. Respondent does not persuade us of any material defect in that conclusion.

convincing evidence" standard itself only when the Board makes findings of its own – which it did not do in this case.[5]

Lastly, respondent claims the Board disregarded its procedures and violated Board Rule 7.16 (a) by failing to consider motions he filed to dismiss the charges and to strike expert witness testimony.  The record does not support this claim.  Rule 7.16 (a) required the Board to "rule on" respondent's motions "in its disposition in the case" after receiving the Hearing Committee's "proposed disposition" of the motions "and the reasons therefor."  D.C. Bar Rule XI, § 9 (c) allowed the Board to "adopt" the Hearing Committee's recommendation as its disposition.  In its report to this court, that is how the Board complied with Rule 7.16 (a) – after acknowledging that respondent's motions were before it, the Board ruled on (and denied) them by expressly adopting ("incorporat[ing] by reference") the Hearing Committee's entire report and recommendation.

Furthermore, respondent fails to persuade us that either motion had merit.  In his motion to dismiss the disciplinary charges against him, respondent argued that

---

[5]  *See, e.g.*, *In re Martin*, 67 A.3d at 1039 (stating that the Board "has the power to make its own factual findings" but "must accept the hearing committee's factual findings if they are supported by substantial evidence on the record as a whole") (quoting *In re Micheel*, 610 A.2d 231, 234 (D.C. 1992)).

he could not be held liable to his client in a malpractice action for mishandling his personal injury lawsuit because his client had no cause of action on which he could have prevailed in that suit[6] and therefore had "los[t] nothing" as the result of respondent's negligence.[7] The patent flaw in this argument is that a disciplinary proceeding is not a malpractice action. In a malpractice action, a plaintiff must prove his damages in order to recover them. But the goals of a disciplinary proceeding are different. We have recognized that "[w]hen viewed from the perspective of the disciplinary system's responsibility to protect the public from unworthy attorneys, to maintain the integrity of the profession, and to deter shoddy practice, it is clear that whether the client happens to be prejudiced or not should not determine the outcome of disciplinary cases involving neglect."[8] Although

---

[6] Respondent cited Pennsylvania law applying the doctrine of assumption of the risk to the sport of downhill skiing. *See Hughes v. Seven Springs Farm, Inc.*, 762 A.2d 339 (Pa. 2000).

[7] In support of this argument, respondent relied on the decision of this court's predecessor in *Niosi v. Aiello*, 69 A.2d 57, 60 (D.C. 1949) ("Unless a party has a good cause of action against the party proposed to be sued, the first party loses nothing by the conduct of his attorney even though the latter were guilty of gross negligence.").

[8] *In re Banks*, 461 A.2d 1038, 1041 (D.C. 1983).

prejudice to the client is an element of some disciplinary violations,[9] it is not an element of the violations of D.C. Rules of Professional Conduct 1.1 and 1.3 (a) and (c) with which respondent was charged.[10] Thus, the putative lack of injury to his client from respondent's mishandling of his lawsuit did not operate to "absolve respondent of his professional obligations"[11] or immunize him from disciplinary sanction for his neglect of them.

Respondent's motion to strike expert testimony also was faulty. In the proceedings before the Hearing Committee, each side presented expert opinion testimony directed to whether respondent's representation met the standard of care expected of lawyers in personal injury cases. Disciplinary Counsel's expert was Peter Grenier. In a post-hearing motion, respondent moved to strike Mr. Grenier's report and testimony on two grounds: first, that his testimony was unsworn, and

---

[9] *See, e.g.*, D.C. Rule of Professional Conduct 1.3 (b)(2) ("A lawyer shall not intentionally . . . [p]rejudice or damage a client during the course of the professional relationship.").

[10] *See In re Banks*, 461 A.2d at 1041 ("[P]rejudice to the client is not an element of a charge of neglect, although the existence *vel non* of prejudice to the client may be relevant on the issue of sanction."); *see also In re Shelnutt*, 719 A.2d 96, 97 (D.C. 1998) ("Professional disciplinary violations arise from malfeasance, not the actual harm imposed upon a client.").

[11] *Shelnutt*, 719 A.2d at 97 (footnote omitted).

second, that it was inadmissible under the rules of evidence because it "was merely his own personal opinion as to what should have been done and was not based upon an established standard of care."

For the following reasons, neither of these grounds has merit. First, the hearing transcript states that Mr. Grenier testified "after having been first duly sworn by the Chairman" of the Hearing Committee. Respondent has proffered nothing to contradict this, nor did he object contemporaneously that Mr. Grenier was not under oath. Second, respondent waived or forfeited his substantive objections to Mr. Grenier's opinion testimony by (1) not objecting to the inclusion of Mr. Grenier's report in Disciplinary Counsel's hearing exhibits, (2) agreeing at the outset of the hearing that Mr. Grenier was qualified to give opinions on the standard of care for lawyers in personal injury cases, and then (3) neither objecting to Mr. Grenier's expert opinion testimony on the grounds advanced in his motion to strike nor cross-examining Mr. Grenier on the basis for his opinions.

Third, in point of fact, as Mr. Grenier repeatedly made clear, he was not merely offering personal opinions but rather was applying his knowledge of the standard of care (e.g., "my answers are limited, if you will, to my experience and knowledge on the standards of care for a personal injury case") gained from his

extensive experience practicing and teaching in the field of personal injury law in the District of Columbia and throughout the country (which was described in detail in his report). Fourth, even if that had not been so, Mr. Grenier's testimony was admissible in this proceeding under the Rules of the Board regardless of the rules of evidence applicable in other proceedings. Board Rule 11.3 says "[e]vidence that is relevant, not privileged, and not merely cumulative *shall be received*" (emphasis added) and leaves it to the Hearing Committee to determine what "weight and significance" to give it. The Rule further provides that "[t]he Hearing Committee may be guided by, but *shall not be bound by*[,] the provisions or rules of court practice, procedure, pleading, *or evidence*, except as outlined in these rules or the Rules Governing the Bar." (Emphasis added.) It was within the ambit of the Hearing Committee's discretion to find Mr. Grenier's testimony relevant to its evaluation of respondent's performance and hence admissible under Rule 11.3. For all these reasons, we conclude that the Board and Hearing Committee did not err in denying respondent's motion to strike Mr. Grenier's testimony.

Having addressed respondent's exceptions to the Board's report, we turn to the question of an appropriate sanction for respondent's professional misconduct. "The imposition of sanction in bar discipline cases is not an exact science and may

depend on the facts and circumstances of each particular proceeding."[12]   D.C. Bar Rule XI, § 9 (h) "endorses the Board's exercise of a broad discretion" in selecting the sanction to be imposed,[13] and we owe respect for the Board's considered judgment in the matter.  Its recommendation therefore comes to us with "a strong presumption in favor of its imposition."[14] "Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed."[15]   We are "especially deferential" to the Board's recommendation where, as here, neither the respondent nor Disciplinary Counsel takes issue with its appropriateness.[16]

Agreeing with the Hearing Committee, the Board recommends that respondent be suspended from the practice of law for six months.  This is twice the length of the suspension that Disciplinary Counsel originally sought.  The Board and Hearing Committee consider a six-month suspension to be at the top of the range of sanctions that have been imposed in comparable cases involving neglect

---

[12] *In re Austin*, 858 A.2d 969, 975 (D.C. 2004).

[13] *In re Haupt*, 422 A.2d 768, 771 (D.C. 1980).

[14] *In re Hallmark*, 831 A.2d 366, 371 (D.C. 2003).

[15] *Id*. (quoting *In re Goffe*, 641 A.2d 458, 463-64 (D.C. 1994)).

[16] *In re Grimes*, 687 A.2d 198, 198 (D.C. 1996).

and incompetence. They view it as justified by the presence in this case of significant aggravating factors – notably, the egregiousness and protracted nature of respondent's misconduct, his failure to acknowledge it and accept responsibility, and what the Committee found to be the evasiveness and dishonesty of his testimony.

On the facts before us, we agree that a stern sanction is necessary – "not to punish the attorney but to protect the public and the courts, to maintain the integrity of the profession, and to deter other attorneys from engaging in similar misconduct."[17] For the reasons persuasively set forth in the report before us, we defer to and accept the Board's recommendation of a six-month suspension.[18]

---

[17] *In re Pierson*, 690 A.2d 941, 948 (D.C. 1997).

[18] Our respectful deference to the Board's carefully considered recommendation should not be understood as reflecting a view on our part that an even greater sanction would have been unwarranted. Arguably, for example, it would have been reasonable in the circumstances of this case to include a requirement that respondent furnish proof of rehabilitation as a condition of his reinstatement to practice. *See* D.C. Bar R. XI, § 3 (a)(2); *In re Cater*, 887 A.2d 1, 24 (D.C. 2005) (holding that a fitness requirement is justified where the evidence clearly and convincingly raises a "serious doubt," i.e., "real skepticism," as to the suspended attorney's continuing fitness to practice law). We have not been asked to impose such a condition, however, and we will not do so *sua sponte* in this case. We note in this regard that, at oral argument, respondent's counsel asked us to take into consideration the fact that respondent has retired from the practice of law. Disciplinary Counsel has not disputed that representation.

Accordingly, respondent Nathaniel H. Speights is hereby suspended from the practice of law in the District of Columbia for a period of six months, effective thirty days from the date of this opinion. Within ten days thereafter, respondent must file an affidavit in compliance with D.C. Bar Rule XI, § 14 (g). For purposes of reinstatement, respondent's suspension will be deemed to run from the date he files that affidavit.

*So ordered.*

APPENDIX

Report and Recommendation of the Board on Professional Responsibility, In re: Nathaniel H. Speights, Board Docket No. 12-BD-017

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of:                    :
                                     :
    NATHANIEL H. SPEIGHTS,           :
                                     :
Respondent.                          :        Board Docket No. 12-BD-017
                                     :        Bar Docket No. 2010-D048
A Member of the Bar of the           :
District of Columbia Court of Appeals :
(Bar Registration No. 952036)        :

REPORT AND RECOMMENDATION
OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

Respondent Nathaniel H. Speights is charged with violations of Rules 1.1(a) (failure to provide competent representation), 1.1(b) (failure to represent client with the skill and care afforded by other lawyers in similar matters), 1.3(a) (failure to represent his client zealously and diligently), and 1.3(c) (failure to act with reasonable promptness), arising out of his representation of Anders Bjorgung and his parents in a personal injury case concerning injuries Anders suffered in a skiing accident. The Ad Hoc Hearing Committee's report, dated June 8, 2015, found that there was clear and convincing evidence that Respondent committed all of the charged rule violations, and recommended that he be suspended from the practice of law for six months.

Disciplinary Counsel[1] took no exception to the Report and Recommendation of the Hearing Committee. Respondent took exception to the Hearing Committee's findings and recommended sanction. In his brief to the Board, Respondent argues that the Hearing

---

[1] This case was filed by the Office of Bar Counsel. The District of Columbia Court of Appeals changed the title of Bar Counsel to Disciplinary Counsel, effective December 19, 2015. We use the current title herein.

Committee erred in denying his motion to dismiss the charges against him, and in denying his motion to strike the testimony of Disciplinary Counsel's expert. Respondent also argues that many of the Hearing Committee's findings of fact and credibility determinations were in error, and that the evidence was insufficient to conclude that Respondent committed any Rule violation. No oral argument was held before the Board.[2]

The Board, having reviewed the record and the briefs of the parties, concurs with the Hearing Committee's factual findings as supported by substantial evidence in the record and with its conclusions of law.[3] For the reasons set forth in the Hearing Committee's Report and Recommendation, which is attached hereto and incorporated by reference, we recommend that Respondent be suspended for six months. We further recommend that the period of suspension

---

[2] Oral argument was initially scheduled for October 8, 2015. By order dated September 1, 2015, the Board rescheduled the oral argument for November 5, 2015. Respondent's counsel did not appear for the scheduled oral argument. On November 10, 2015, Respondent moved to reschedule the oral argument, asserting that he had not received service of the Board's September 1 scheduling order. Disciplinary Counsel opposed Respondent's motion to reschedule. By order dated November 25, 2015, the Board rescheduled the oral argument for January 14, 2016. However, on January 13, 2016, Respondent moved to submit the matter on the parties' briefs. By order dated January 14, 2016, the Board granted Respondent's motion to consider the case based on the available record, and cancelled the oral argument.

[3] The Hearing Committee found "clear and convincing evidence that Respondent violated Rules 1.1(a) and (b) when he failed to" perform thirteen tasks listed at pages 27-28 of the report. Similarly, the Hearing Committee found that Respondent violated Rules 1.3(a) and (c) when he failed to perform six tasks listed at pages 29-30 of the report. The Board concludes that Respondent committed the charged Rule violations based on the entire course of conduct listed at pages 27-28 and 29-30 of the Hearing Committee report. The Board does not reach the issue of whether any one of the listed omissions, by itself, would be sufficient to find a Rule violation.

run for purposes of reinstatement from the filing of the affidavit required by D.C. Bar R. XI, § 14(g). *See In re Slosberg*, 650 A.2d 1329, 1331-33 (D.C. 1994).

BOARD ON PROFESSIONAL RESPONSIBILITY

By: *Billie LaVerne Smith*
    Billie LaVerne Smith

Dated: OCT 1 1 2016

All members of the Board concur in this Report and Recommendation, except Ms. Butler and Mr. Bernstein, who are recused.

3

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
AD HOC HEARING COMMITTEE

In the Matter of: :
:
    NATHANIEL H. SPEIGHTS, :     Board Docket No. 12-BD-017
:     Bar Docket No. 2010-D048
Respondent. :
:
A Member of the Bar of the :
District of Columbia Court of Appeals :
(Bar Registration No. 952036) :

## REPORT AND RECOMMENDATION OF THE AD HOC HEARING COMMITTEE

This matter arises out of Respondent Nathaniel H. Speights' representation of Anders Bjorgung and his parents in connection with injuries Anders suffered in a skiing accident. Bar Counsel alleges that Respondent violated D.C. Rules of Professional Conduct ("Rules") 1.1(a) (failure to provide competent representation), 1.1(b) (failure to represent client with the skill and care afforded by other lawyers in similar matters), 1.3(a) (failure to represent his client zealously and diligently), and 1.3(c) (failure to act with reasonable promptness). Respondent denies that he committed the alleged violations. For the reasons set forth below, the Hearing Committee finds that Bar Counsel established violations of Rules 1.1(a), 1.1(b), 1.3(a), and 1.3(c) and recommends that he be suspended for six months.

### I.    Procedural Background

Bar Counsel filed a Petition Instituting Formal Disciplinary Proceedings and a Specification of Charges against Respondent on May 24, 2012 (BX E),[1] and served Respondent on June 1, 2012. BX F. Respondent timely filed his Answer (BX H) and filed a Motion to

---

[1] "BX __" refers to Bar Exhibits, "RX __" refers to Respondent's Exhibits, "Tr. __" refers to the hearing transcript.

Dismiss the Specification of Charges. BX G. Pursuant to Board Rule 7.16(a) and *In re Ontell*, 593 A.2d 1038, 1040 (D.C 1991), the Hearing Committee deferred consideration of Respondent's motion. The Hearing Committee now recommends that the motion be denied. *See* Part III.A, *infra.*

On November 29, 2012, Bar Counsel moved to strike the expert report and prohibit the testimony of Respondent's proffered expert witness, Randell Hunt Norton, Esquire, on the ground that he intended to offer an opinion that Respondent's conduct did not violate the charged Rules of Professional Conduct. Respondent opposed the motion, arguing that Mr. Norton was providing expert opinion as to the applicable standard of care in personal injury cases. The Hearing Committee granted the motion to strike, and prohibited expert testimony regarding the question whether Respondent had committed the alleged rule violations. The Hearing Committee allowed Mr. Norton to testify as to the applicable standard of care. The Hearing Committee also ordered Respondent to file a copy of Mr. Norton's report, after redacting all references to his opinions as to the charged rule violations. *Id.* Respondent timely filed an amended expert report.

Respondent's witness list also included two physicians: Dr. Melinda Garner and Dr. Lauro Halstead. Respondent proffered that Dr. Garner would testify that an arm injury Respondent suffered in a March 2004 car accident "merited [Respondent's] taking a leave of absence from March 2004 to December 2005," and that Dr. Halstead would testify about "the nature and extent of his treatment of the Respondent." On December 12, 2012, Bar Counsel moved to exclude evidence relating to the arm injury, on the ground that Respondent had failed to give the required notice under Board Rule 7.6(a) to assert disability in mitigation. In a response to Bar Counsel's motion, Respondent explained that he did not seek to introduce

2

evidence of disability pursuant to Board Rule 7.6 and *In re Kersey*, 520 A.2d 321 (D.C. 1987), but rather to explain the circumstances surrounding his alleged misconduct. The Hearing Committee admitted this evidence, and deferred addressing its relevance. Tr. 22-23. The relevance of the evidence of Respondent's arm injury is discussed *infra* at pages 21-22.

The hearing was held on December 20 and 21, 2012, and January 25, 2013, before Laura S. Shores, Esquire, Chair, David Bernstein, Public Member, Lucy Pittman, Esquire, Attorney Member. Assistant Bar Counsel Hamilton P. Fox, III, Esquire, appeared for the Office of Bar Counsel; David A. Carr, Esquire, appeared for Respondent. Respondent was present throughout the hearing. Both sides presented documentary exhibits, all of which were admitted into evidence. *See* BX A-H and 1-86; RX 1-10; Tr. 756-59. Bar Counsel called four witnesses: Anders Bjorgung, the complainant; Joan Ellis, the complainant's mother; Respondent, and Peter C. Grenier, Esquire, an expert in representing plaintiffs in personal injury litigation. Respondent called three witnesses: Keith W. Watters, Esquire, who served as co-counsel with Respondent in the underlying matter; Mr. Norton, who testified as an expert in representing plaintiffs in personal injury litigation; and Dr. Halstead. Respondent also offered as an exhibit the deposition testimony of Dr. Gardner, Respondent's treating physician.

Following the close of the evidence relating to the alleged rule violations, the Hearing Committee made a preliminary, non-binding determination that Bar Counsel had proved at least one rule violation. Tr. 763; *see* Board Rule 11.11. Bar Counsel then offered two additional exhibits in aggravation of sanction, which were admitted. *See* BX 87, 88. After the hearing closed, Respondent moved to strike BX 88. Bar Counsel did not oppose that motion. Respondent also moved to strike the testimony of Bar Counsel's expert witness, Peter Grenier.

Bar Counsel opposed that motion. As discussed in Part III.A, *infra*, Respondent's motion to strike BX 88 is granted, and Respondent's motion to strike Mr. Grenier's testimony is denied.

## II. Findings of Fact

1. Respondent, Nathaniel H. Speights, was admitted to the District of Columbia Bar on June 15, 1978, and subsequently assigned Bar number 952036. BX A.

2. On April 23, 2001, Anders Bjorgung ("Anders"), and his parents, Anders Bjorgung ("Bjorgung Sr.") and Joan Ellis ("Ellis"), engaged Respondent's law firm, Speights and Mitchell, to represent them in connection with injuries Anders had suffered in a February 10, 2001 skiing accident at the Whitetail Mountain Ski Resort in Mercersburg, Pennsylvania. Anders, Bjorgung Sr., Ellis, and Respondent signed the "Legal Representation Agreement." This was a contingent fee engagement, with the clients responsible for paying expenses. BX 73; Tr. 32-33, 37 (Ellis); Tr. 95-97 (Anders).

3. Prior to the accident, Anders and his father signed releases which, under the Pennsylvania Skier's Responsibility Act (42 Pa. C.S.A. § 7102(c)), would require the plaintiffs to prove gross negligence in order to recover damages arising out of the skiing accident. Tr. 35-37 (Ellis); Tr. 97-89 (Anders); Tr. 125, 130-31, 155 (Respondent); Tr. 272 (Grenier).

4. A claim arising out of the accident was subject to a two-year Statute of Limitations. *See* 42 Pa. C.S.A. § 5524. However, because Anders was a minor at the time of the accident, the Statute of Limitations for his claims did not expire until two years after his 18th birthday. *See* 42 Pa. C.S.A. § 5533. Thus, the Statute of Limitations for Anders' parents' claims would expire on February 9, 2003, but Anders' claims would not expire until he turned 20, or November 24, 2003. Tr. 333 (Grenier).

4

5.	Respondent did not place the potential defendants on notice of Anders' claims or his parent's claims, or warn them to preserve evidence. *See generally* Tr. 266-71 (Grenier). Indeed, Respondent did not conduct a sufficient investigation to enable him to identify the proper defendants.  Bar Counsel's expert testified that in order to determine the proper defendant, Respondent should have done a title search, checked the Recorder of the Deeds office, run a report on the property address, used an investigator, "or perhaps even [sent] a letter to Whitetail Resort Limited Partnership," (a business entity Respondent identified by searching through the Pennsylvania Department of State web site), which may have generated a response identifying the proper property owner.  Tr. 270, 325, 327-28, 330-31 (Grenier).  Instead, Respondent's only effort to identify the owner and operator of the ski resort consisted of an internet search.  The documents he found, (RX 3 and 4), did not identify the owner or operator of the ski resort.  Tr. 143-47 (Respondent); Tr. 324-29 (Grenier).  We credit Bar Counsel's expert's testimony on this issue, as it was unrebutted by Respondent's expert.

6.	Moreover, there is no evidence that Respondent conducted any meaningful investigation regarding the facts of the case before filing a lawsuit, and his client files contained relatively few materials, which were apparently obtained from the ski resort.  Tr. 38-40 (Ellis); Tr. 271 (Grenier); Tr. 612 (Norton).  Respondent failed to preserve Anders' records of online conversations with his friends regarding the accident, which could have been used to identify witnesses and obtain their statements for the case.  *Id.*; *see also* Tr. 100 (Anders).  Bar Counsel's expert testified that the standard of care for representing a plaintiff in a personal injury action required that Respondent keep a copy of any witness statements or notes.  Tr. 416-17 (Grenier). Respondent's expert testified generally that Respondent's investigation prior to filing suit was within "the standard practice . . . among plaintiff's lawyers, and there was nothing unusual

about" the extent of Respondent's investigation. Tr. 504 (Norton). Mr. Norton did not specifically deny, however, that Respondent's failure to diligently seek out witnesses, to procure witness statements, or to preserve evidence of witnesses' contemporaneous exchanges with his client failed to meet the standard of care. Thus, we credit the testimony of Bar Counsel's expert that Respondent should have taken efforts to discover and preserve such evidence. Respondent also failed to make an adequate effort to determine whether other evidence existed that might support his client's claims.

7. Although Respondent told the Bjorgung family that he had employed a private investigator, he never provided them with an investigator's reports. Tr. 44 (Ellis); Tr. 100 (Anders); Tr. 140-41 (Respondent). Respondent testified that he could not remember the name of the investigator and admitted that he had no copies of any reports prepared by an investigator or invoices supporting his claim that he retained one. Tr. 224-25 (Respondent). Respondent insisted that the investigator did prepare reports, but claimed that they would not have been kept in the client file. Tr. 141 (Respondent). Based on our assessment of Respondent's credibility and the lack of corroborating evidence, we find that Respondent did not retain an investigator, and his testimony that he hired an investigator was dishonest. We see no reason—and Respondent did not give one—why a lawyer would not keep copies of an investigator's reports in the client's file. The absence of any documentary evidence of the investigator's retention or any reports, and Respondent's professed inability to recall the investigator's name, persuades us that no investigator was retained. Moreover, Respondent's demeanor during this part of his testimony, as it was at several points during examination by Bar Counsel, was dismissive, if not belligerent. We find that his testimony on this subject was deliberately false, which further

6

confirms our finding that he failed to make adequate efforts to obtain evidence that might have supported his client's claims.

8.      On November 21, 2003, four days before the expiration of the Statute of Limitations on Anders' claims, Respondent caused a *pro se* complaint to be filed on Anders' behalf in the United States District Court for the Middle District of Pennsylvania. BX 2; Tr. 333 (Grenier). The action was filed as a *pro se* complaint because Respondent was not admitted to practice in the Middle District of Pennsylvania, and had not engaged local counsel, despite having told his clients that he would do so. Tr. 38, 40-41 (Ellis); Tr. 100-101 (Anders); Tr. 174-78 (Respondent).

9.      Respondent's expert testified that filing close to the expiration of the Statute of Limitations gives a personal injury plaintiff an advantage because it catches the defendant unaware and unprepared. *See* Tr. 507-08 (Norton) (testifying to the advantage of late-filing: that the plaintiff will be prepared to go forward, while the defendant might not be prepared). We find that Respondent did not delay in filing suit in order to gain an advantage. Respondent was not prepared to prosecute the suit, having conducted limited research to determine the proper defendants, and limited factual investigation, and having failed to retain local counsel or gain his admission *pro hac vice*. We find that Respondent delayed in filing the suit because he was not prepared to file suit any sooner, and his delay in filing suit was not a strategic decision.

10.      The complaint Respondent prepared alleged that Anders had incurred medical expenses and sought damages to recover those expenses. BX 2 at 19. However, these expenses were not recoverable, because Anders did not pay them. His parents and their insurance company paid Anders' medical expenses, and any claim for reimbursement was theirs, not Anders'. Tr. 278-79 (Grenier). But by November 21, 2003, when Anders' *pro se* complaint was

7

filed, the two-year Statute of Limitations on his parents' claims had expired pursuant to 42 Pa. C.S.A. § 5524. Tr. 279-81 (Grenier). Respondent thus never filed suit to recover the parents' medical expenses, having concluded, incorrectly, that any amount recovered would be fully subrogated to their insurance company. Respondent advised Anders' parents accordingly. Tr. 42-43 (Ellis). Bar Counsel's expert testified that if the parents had joined the lawsuit, and it had been filed within two years of the date of the accident (February 9, 2003), the parents could have recovered substantial medical damages, assuming liability had been established. Tr. 279-81 (Grenier). Respondent's expert testified that he thought Respondent "gave appropriate advice" regarding the subrogation rights of the medical insurer, but acknowledged that he was unsure of the Pennsylvania law on the collateral source rule for medical damages. Tr. 510 (Norton). We credit the testimony of Bar Counsel's expert, who reviewed the relevant Pennsylvania statutes and case law prior to preparing his report and testimony. Thus, we find that Respondent incorrectly advised Anders' parents regarding their potential recovery.

11. The jurisdictional portion of the complaint alleged that the "matter in controversy exceeds the sum of Fifty Thousand ($50,000) Dollars" (BX 2 at 17); however, in order to properly invoke federal jurisdiction based on diversity of citizenship, Respondent was required to plead that the amount in controversy exceeded $75,000. *See* 28 U.S.C. § 1332(a); Tr. 340-41 (Grenier), 650-52 (Norton); *see also* Tr. 139-40 (Respondent). Bar Counsel's expert testified that by "having pled less than the required jurisdictional amount, this complaint [was] defective on its face" and the court could have summarily dismissed the complaint. Tr. 341-42 (Grenier). We credit the testimony of Bar Counsel's expert, as it is consistent with the requirements of 28 U.S.C. § 1332(a) in effect at the time.

12.     The complaint named as defendants Whitetail Resort and Whitetail Ski Company, Inc., alleging that at the time of the accident, Whitetail Resort owned the real property on which the ski resort was located, and that Whitetail Ski Company, Inc. operated the resort. BX 2. The defendants filed an answer on January 20, 2004, in which they disclosed that at the time of the accident, the property owner was Snow Time, Inc., and that the operator was Whitetail Mountain Operating Corp. The answer also provided the addresses of these entities. BX 3; Tr. 163-64 (Respondent). Respondent, however, made no effort to amend the complaint. In the Joint Case Management Plans, which were filed on May 24, 2004, and November 22, 2004, the named defendants reiterated that they did not own or operate the ski area. The November 22, 2004 Joint Case Management Plan again set forth the correct names and addresses of the actual owner and operator of the ski area. Despite being informed of the proper party defendants on these occasions, Respondent did not make any effort for three-and-a-half years to amend the complaint to include the proper owner and operator as parties. *See* Tr. 329-32 (Grenier), 668-69 (Norton).

13.     Respondent did not seek *pro hac vice* admission in the Middle District of Pennsylvania until February 20, 2004, almost three months after the *pro se* complaint was filed. BX 6. Respondent sought *pro hac vice* admission on his own behalf, without a local counsel, which was granted. BX 1 at 2.[2]

14.     After his *pro hac vice* admission, Respondent sought a 40-day continuance of the case management conference previously scheduled by the district court. BX 5; BX 7; Tr. 185 (Respondent). Respondent's expert conceded that when representing a plaintiff "it's never in the

---

[2] It is not clear in the record how Respondent was able to obtain *pro hac vice* admission without first retaining local counsel. *See* M.D. Pa. Local Rule 83.8.2.1 (requiring that counsel seeking admission *pro hac vice* must associate with local counsel). However, his ability to obtain *pro hac vice* admission without local counsel does not affect the Hearing Committee's consideration of the alleged rule violations.

interest of the client to have any delay . . . ." Tr. 534 (Norton); *see also* Tr. 626-27 (Norton). Nevertheless, this was the first in a series of motions to postpone the initial case management conference, all made by Respondent. BX 9; BX 14 at 88.

15.     The court granted the motion and continued the case management conference until April 20, 2004, and directed the parties to file a case management plan by April 15, 2004. BX 8; Tr. 187 (Respondent).  The order provided that the conference would be by conference call, to be initiated by Respondent. BX 8.

16.     Respondent did not file a case management plan by the deadline.  Instead, on April 19, 2004, four days after the case management plan was due, Respondent moved for an additional 60-day continuance on the ground that, five weeks earlier, he had suffered a severe arm fracture leading to nerve damage. BX 9.  The court granted Respondent's motion in part, and continued the conference for 30 days, until May 27, 2004, with the case management plan due on May 21. BX 10.

17.     On May 24, 2004, defendants' counsel sent a draft case management plan to Respondent, and filed a partial case management plan with the court. BX 11-12; *see also* BX 14. In his cover letter to Respondent enclosing the partial plan, defense counsel reminded Respondent that he was to initiate the May 27 conference call. BX 11. Respondent did not do so, and the call never took place. BX 14 at 88-89; Tr. 192 (Respondent).

18.     On October 1, 2004 the court ordered that a scheduling conference be held on November 10, 2004, with the case management plan due on November 5. BX 13.

19.     Once again, the case management plan was not timely filed because Respondent did not coordinate with defense counsel or cooperate in preparing it.  The case management conference call went ahead as scheduled on November 10, 2004. BX 14 at 89.  During the

scheduling conference, Respondent claimed that he was unable to represent the plaintiff effectively because he had suffered a debilitating arm injury. *Id.* The court ordered him to transfer responsibility for the case to Keith Watters, Esquire, a member of the District of Columbia Bar and Respondent's close friend (Tr. 455-56 (Watters)), and to associate with local counsel. BX 14 at 89. The court, for a third time, ordered the parties to file a case management plan. The court set November 17, 2004 as a deadline for transferring the case to Watters and filing the case management plan, and scheduled a case management conference for December 1, 2004. BX 13.

20.     The court warned Respondent, during the telephone conference call, that if he failed to comply with these deadlines, it might dismiss the case and impose sanctions on Respondent *as well on as the Plaintiff.* Tr. 363-64 (Grenier). A written order entered on November 16, 2004, memorialized these directives. BX 14.

21.     Mr. Watters did not move to enter his appearance by November 17, 2004. No one was associated as local counsel by November 17 or thereafter. BX 1 at 6; Tr. 374 (Grenier). Respondent testified that it was not until he received a written order dated November 16 in the mail on November 19, that he understood that Watters was to enter his appearance by November 17—a date which had already passed. *See* Tr. 197-99 (Respondent). We find Respondent's testimony that he had no notice of the deadline for Mr. Watters to enter an appearance before the deadline was dishonest because the order had been given orally on November 10 during the case management call, in which Respondent participated. BX 16 at 2. The written order dated November 16 merely memorialized the oral order given on November 10; therefore, Respondent had one week's notice of his obligation to have Mr. Watters enter an appearance. Respondent testified that the November 16 order was inaccurate, and the requirement that Mr. Watters enter

11

his appearance was not, in fact, discussed during the November 10 phone call. However, an order issued on December 1, 2004 refutes this claim: it states that "[t]he Court verbally advised Plaintiff to transfer responsibility for this case to Keith Waters, Esq., and explicitly directed Plaintiff's counsel to affiliate with local counsel immediately." As counsel for Plaintiff, Respondent was obliged to comply with the court's order to ensure that Watters filed an appearance and to engage local counsel on his client's behalf. Thus, we find that Respondent's testimony to the contrary is squarely contradicted by the record and is dishonest. *Compare* Tr. 199 (Respondent), *with* BX 16 at 2. The parties finally filed a case management plan on November 22, 2004. BX 15. As part of that plan, Respondent said he was "exploring the possibility" of adding Whitetail Mountain Operating Company as a defendant. BX 15 at 97. This never occurred. BX 1.

22. On December 1, 2004, the court dismissed the case without prejudice, stating that it "will no longer tolerate Plaintiff's counsel's disregard of this Court's orders nor Plaintiff's counsel's inattention to this case." BX 16. It did not impose the threatened sanctions against Anders. Respondent unsuccessfully sought reconsideration of the dismissal order (BX 18-20), and then appealed the dismissal to the United States Court of Appeals for the Third Circuit. BX 21.[3]

---

[3] While the appeal was pending, Respondent filed a new complaint on February 3, 2005—not an amendment to the initial complaint, but a new proceeding with a different case number, 1:05-cv-00235. BX 23. The defendants moved to dismiss the newly-filed complaint on Statute of Limitations grounds. BX 26. Respondent opposed the motion to dismiss on the ground of equitable tolling. On June 10, 2005, the court granted the motion to dismiss, rejecting Respondent's equitable tolling argument because the first case (Case No. 1:03-cv-02114) had been dismissed "due to the repeated failure of Plaintiff's counsel to comply with the most basic of this Court's Orders and procedural requirements." BX 30 at 220; BX 27, 28. It referred to Respondent's conduct as "continued negligence." *Id.* Respondent did not appeal from the dismissal of the second case. BX 22 at 147.

23. On July 13, 2006, the Third Circuit reversed the district court's order dismissing the case, and remanded the case to the district court for further consideration of additional factors governing dismissal set forth in *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984). In so doing, the court criticized Respondent by name:

> Suffice it to say that plaintiff's attorney, Mr. Speights, requested—and was granted—multiple continuances of a pre-trial telefonic [sic] conference with the district court and opposing counsel. From our review of the record, it appears that he failed on numerous occasions to initiate the pretrial [sic] telefonic [sic] conference which had been continued, as the district court had ordered. When the district court granted its final continuance of the pre-trial conference, it warned Mr. Speights (both orally and in writing) that failure to comply with its orders could result in dismissal of the case. When its orders were not followed, the district court did finally dismiss the case.

BX 31 at 226.

24. The case was remanded to the district court on August 4, 2006. BX 31. The district court scheduled the case for another case management conference and required that a case management plan be filed. BX 1 at 7; BX 31.

25. Pursuant to that order, on September 28, 2006, the parties filed a joint case management plan. BX 75. In the case management plan, the defendants again contended that Respondent had sued the wrong parties. *Id.* at 3-4, 9. Respondent again said he was still "exploring the possibility" of adding Whitetail Mountain Operating Corp. as a defendant. *Id.* at 8.

26. On October 30, 2006, the district court judge cancelled the scheduled case management conference and referred the case to a magistrate judge for all pretrial matters. BX 32. The magistrate judge held a case management conference on November 17, 2006, and issued a case management order on November 20, 2006. This order provided that any additional parties must be added "on or before *November 1, 2006*." BX 35 at 243 (emphasis added). Even though

13

this date had passed before the conference was held and the order issued, Respondent did not attempt to clarify what seemed to be a clear typographical error. Tr. 679-83 (Norton). Nor did he seek to amend the complaint in 2006 to add Whitetail Mountain Operating Corp., as he said in the case management plan that he might do (BX 75 at 8), or attempt to add Snow Time Inc. BX 1 at 7-8; Tr. 215 (Respondent).

27. In December 2006, the defendants moved for partial summary judgment on Anders' claim for medical expenses paid by his parents and their insurer. BX 37. On January 11, 2007, the magistrate judge recommended that the defendants' motion be granted. BX 43 at 7. On June 5, 2007, the district court adopted this recommendation and granted summary judgment on Anders' claims for medical expenses. BX 52.

28. The court's November 20, 2006 case management order provided that non-expert discovery be completed by February 22, 2007, which was also the deadline for filing dispositive motions. BX 35 at 244-45. Plaintiff's expert reports were due by March 1, 2007. *Id.* at 243.

29. In the case management plan, the defendants listed 17 witnesses, in addition to Anders, and Respondent represented that he would take up to 10 depositions and serve up to 30 interrogatories, 30 requests for production of documents, and 30 requests for admissions. BX 75 at 11-12, 15. However, Respondent took *no* depositions. Tr. 223, 226-28 (Respondent). He testified that defendants had not identified any witnesses (Tr. 227-28 (Respondent)), but this testimony is directly contradicted by the case management plans, which clearly identified the defendants' witnesses. *See* BX 11 at 66, BX 15 at 101, BX 17 at 122 and BX 75 at 12. We find that Respondent's testimony on this topic was dishonest. When Bar Counsel challenged his claim that defendants never identified any witnesses, Respondent answered "nope" in a defiant tone of voice. Tr. 228 (Respondent). The transcript reflects that when Bar Counsel moved to a

different topic after Bar Counsel sought confirmation of Respondent's claim that defendants "didn't disclose a single human being that was going to testify to help their case," Respondent "chuckl[ed]." *Id.* Again, Respondent's attitude confirms our view that his testimony was dishonest. We accordingly reject his excuse for not taking the deposition of any of defendants' witnesses as deliberately false.

30.     Respondent conducted almost no discovery. He served no interrogatories, no timely requests for the production of documents, and no requests for admissions before the discovery deadline. On February 22, 2007, Respondent did serve requests for production of documents and interrogatories. RX 5. These were out of time, and the defendants accordingly refused to respond. BX 51; Tr. 221-22 (Respondent). Respondent made no effort to compel responses to this discovery. BX 1. Bar Counsel's expert testified that Respondent should have propounded interrogatories and requests for production of documents early (Tr. 378 (Grenier)), considered filing requests for admissions (Tr. 378-79 (Grenier)), and taken depositions of corporate defendants pursuant to Federal Rule of Civil Procedure 30(b)(6), which requires an entity to designate a person or persons to testify on its behalf. *Id.* Respondent's expert insisted that "taking no depositions is not necessarily a violation of the standard of care." Tr. 694 (Norton). We credit the testimony of Bar Counsel's expert on this issue, because Respondent's expert based his opinion in part on Respondent's claim that his investigators had spoken with witnesses (a claim that we have rejected in Finding of Fact ¶ 7). Respondent's expert offered no explanation why a plaintiff would not depose a defendant in order to prepare for trial.

31.     Not surprisingly, the defendants did conduct discovery. Respondent's client, Anders, was deposed. Astoundingly, Respondent did not prepare him for his deposition, other than to advise him to testify truthfully; Respondent told Anders that he did not want his

15

testimony to sound coached. Tr. 113 (Anders). Respondent's own expert agreed that this was not consistent with the proper standard of conduct for a plaintiff's lawyer in the District of Columbia and that "you should prepare your client for your [sic] deposition." Tr. 725 (Norton); *see also* Tr. 420-22 (Grenier).

32. Respondent engaged Helge Lien, a Norwegian civil engineer with expertise in the design of ski courses, to serve as an expert witness. Mr. Lien's expert report was due on March 1, 2007. BX 35 at 243. A few days before the report was due, Mr. Lien contacted Respondent's office to ask for an extension of time in which to produce his report. After leaving a message and receiving no response, Mr. Lien eventually sent his report, dated March 7, 2007, to Respondent. BX 54 at 489; BX 71.

33. On March 5, 2007, Respondent emailed Anders' mother regarding the expert report, telling her that he would "late-file" the report and was hopeful that the court would grant a brief delay. BX 47. However, there is no evidence that Respondent ever sought leave to late-file the report. Although it is not clear in the record when Respondent received the report from Mr. Lien, he first provided it to the defendants as an attachment to his opposition to defendants' summary judgment motion (BX 54), which was served on June 19, 2007. BX 60 at 17 n.6.

34. On February 22, 2007, the defendants timely filed three more motions for summary judgment. The first sought summary judgment on the ground that the inherent risks of skiing caused Anders' injuries, and that he had assumed the risk of the accident. BX 44. The second sought summary judgment on behalf of Whitetail Resort and Whitetail Ski Company, Inc. ("the Whitetail parties") on the ground that they were not the owner and operator of the ski resort at the time of the accident. BX 45. The third motion rested on one of the releases purportedly signed by Anders and his father. BX 46.

35.     Pursuant to Middle District of Pennsylvania Local Rule 56.1, a party seeking summary judgment must file a statement of material facts as to which there is no genuine issue to be tried.  The party opposing the motion must then file a responsive statement of material facts identifying those facts that present a genuine issue to be tried.  The rule provides that the moving party's statement of material facts will be deemed admitted unless controverted by the statement required to be served by the opposing party.

36.     Although Respondent opposed the first two motions for summary judgment, he failed to respond to the statement of material facts submitted by defendants.  BX 53, 54; Tr. 402-04 (Grenier).  With respect to the third motion, Respondent violated the district court's rules by attempting to incorporate another party's brief by reference, as his opposition to the motion.  *See* Local Rule 7.8(a).  *Compare* BX 55, *with* Tr. 407-409 (Grenier).

37.     In June 2007, in response to the Whitetail parties' summary judgment motion, Respondent sought for the first time to amend the complaint to substitute Snow Time, Inc. for Whitetail Resort (BX 53 at 467), as the owner of the real property where the accident occurred.  Yet, inexplicably, Respondent made no effort to add Whitetail Mountain Operating Corp. as a defendant in his 2007 motion to amend, despite claiming in the September 28, 2006 case management plan (BX 75 at 8) that he was considering doing so.  BX 53, 56; Tr. 246 (Respondent).

38.     Respondent violated Local Rule 7.5 by failing to file a brief in support of his motion for leave to amend the complaint.  He filed two identical documents, both styled as "Plaintiff's Opposition to Motion for Summary Judgment of Defendants Whitetail Resort and Whitetail Ski Company, Inc. or in the Alternative, Motion to Amend Complaint."  Neither included a brief in support of the motion for leave to amend.  BX 53, 56.

17

39.     On July 11, 2007, the magistrate judge issued a report recommending that defendants' motion for summary judgment based on assumption of risk be granted; that the motion of the Whitetail parties be granted; and that Respondent's motion to amend the complaint be denied.   BX 60.   Because of its rulings on the first two motions, the magistrate judge determined that he did not need to rule on the third, which he recommended be denied as moot. BX 60 at 18-19.

40.     The magistrate judge's report treated the defendants' statements of material facts in the first two motions as admitted, on the ground that Respondent had not filed counter-statements of facts as Local Rule 56.1 required.   BX 60 at 7 n.1, 11 n.4; Tr. 248-49 (Respondent).   Respondent's failure to file the required counter-statements was treated as an admission effectively that (1) the Whitetail parties were not the owner and operator of the ski resort at the time of the accident, and (2) that Anders had assumed the risk of the accident. Respondent filed a statement of material facts as part of an appeal of the magistrate judge's recommendation to the district court, but by that point, it was out of time.   BX 66 at 619-22; Tr. 409-11 (Grenier).

41.     Because Respondent had failed to file a supporting brief as the rule required, the magistrate judge deemed Respondent's motion for leave to amend the complaint as withdrawn. BX 60 at 10 n.2; Tr. 246-48 (Respondent); Tr. 349-51 (Grenier).   Nonetheless, the magistrate judge also addressed the merits of the motion:

> However, the plaintiff has failed to explain his undue delay in seeking to amend his complaint.  The plaintiff was on notice since at least January 20, 2004 – the date of the defendants' answer to the complaint – of the Whitetail defendants' contention that they did not own or operate the Whitetail Ski Area on the date of the plaintiff's accident.  The plaintiff, however, waited until June of 2007 to seek to amend his complaint.

BX 60 at 10.

42. The magistrate judge also refused to consider Mr. Lien's expert report because it had not been served on time, having been first produced to defendants on June 19, 2007 as an attachment to one of Respondent's oppositions to the motions for summary judgment. BX 54 at 489-96. In refusing to consider the report, the magistrate judge noted that Respondent had provided no explanation for the delay. BX 60 at 17 n.6. He also noted that the case management order required that the report be produced by March 1, 2007, that the report was dated March 7, 2007, but that the defendants reported not receiving it until it was attached to the June 19 opposition. On July 27, 2007, Respondent filed an objection to the magistrate judge's report and recommendation, in which he argued that the magistrate judge had erred in refusing to rely on the expert report and that Respondent had produced the report to the defendants on March 7, 2007, rather than March 1, 2007, which Respondent argued was only a difference of four business days. BX 62, p. 11 of 18. However, Respondent testified before the Hearing Committee that in fact he did not receive the report from Mr. Lien until June 19, 2007, the day the opposition to defendants' summary judgment motion was due to be filed. He confessed that his representation to the court as to when he provided the expert report to defendants was not correct. Tr. 254 (Respondent).

43. Bar Counsel's position, as reflected in its proposed conclusions of law, is that Respondent received the report in early March, but failed to provide the report to the opposition until June 19. This is consistent with what Respondent himself told the court at the time, namely that he sent the report to the defendants on March 7. BX 62 at 11. At the hearing, Respondent testified that the statement in his brief to the court was false, and that he received the report on June 19 and sent it to the defendants immediately. Tr. 240-41, 254 (Respondent). We do not find it necessary to resolve this dispute; either way, the report was not timely submitted. There is

no evidence whatever showing that Respondent sought an extension of time, as the expert had asked him to do.

44. The district court adopted the magistrate judge's report and recommendation "in its entirety" in an opinion issued on September 28, 2007. BX 67 at 631. It pointed out that Respondent had been on notice for three-and-a-half years that he had sued the wrong defendants and that to date, he had offered no explanation for his undue delay in seeking to amend. *Id.* at 637.

45. In adopting the recommendation with respect to the assumption of risk motion, the district court refused to consider a case about which Respondent had made "much a-do" in his appeal from the magistrate judge. The case was unpublished, and local rules required that unpublished cases be attached to the briefs that cite them. Respondent had failed to do this, so the court declared that "any references thereto have been disregarded pursuant to Local Rule 7.8. . . ." *Id.* at 638 n.5. The court noted further that the opinion would not have been binding on the court in any event. *Id.*

46. Respondent appealed the district court's ruling to the Third Circuit. BX 69. In an opinion issued on January 8, 2009, the Third Circuit affirmed the judgments in favor of the defendants and the denial of leave to amend. BX 70. Like the district court, the court of appeals emphasized that Respondent "offered no excuse or explanation to the District Court for his delay [in seeking to amend the complaint], nor does he offer any reason for it on appeal." BX 70 at 657.

Respondent's Evidence in Mitigation

47. On or about March 8, 2004 Respondent was injured, breaking his arm in several places, with resulting radial nerve damage and paralysis. Respondent asserted in his Answer to

the Specification of Charges that his injury left him unable to work until December 2005. BX H at 5. He also testified that at the time of the November 2004 case management conference he was still injured and unable to work. Tr. 193-94 (Respondent). However, Respondent made several appearances in D.C. Superior Court beginning in April 2004. *See* BX 74 (April 2004); BX 77, 78 (June 2004), BX 79-81 (July 2004); BX 82 (September 2004); BX 83-84 (October 2004); BX 85 (November 2004). Clearly, despite his injury, Respondent was able to represent clients in litigated matters, even those requiring his physical presence in court.

48. Respondent offered as evidence a transcript of a deposition given by his physician, Dr. Gardner, in an unrelated matter, which detailed his condition and treatment from March 2004 through his release from her care on December 15, 2005, at which point she testified he was 80-90% recovered. RX 8 at 10-11. In the deposition, Dr. Gardner discussed Respondent's slow but steady recovery, but did not address what, if any, limitations Respondent's condition may have had on his practice of law.

49. Respondent, who was a polio victim in his childhood, offered the testimony of Dr. Halstead, who ran a clinic for persons who suffered from health problems after having had paralytic polio years earlier. RX 9; Tr. 438 (Halstead). Dr. Halstead testified that, when he first saw Respondent in November 2007, Respondent suffered from post-polio syndrome, the symptoms of which were increasing weakness and decreased stamina. According to Dr. Halstead, these symptoms would have been aggravated by his 2004 injury. Tr. 440, 450 (Halstead). Nevertheless, Dr. Halstead did not advise Respondent to stop practicing law because of these symptoms (Tr. 450 (Halstead)), and he testified that he did not believe Respondent would have suffered any cognitive impairment in 2004 as a result of his condition. Tr. 451 (Halstead).

21

50. We find that although Respondent suffered health problems as a result of his March 2004 accident, his testimony that he was unable to complete any work on the case until December 2005 was not credible. Neither of his medical providers testified to any cognitive impairment, and neither advised Respondent to stop practicing law as a result of his physical condition. His physical limitations did not prevent him from appearing in court on nine occasions in 2004. While we do not doubt that Respondent's injuries were severe, the evidence shows that Respondent continued to practice despite the injury. We accordingly reject his claim that his health problems prevented him from representing his client at the level the rules require. In addition, had respondent's injury truly prevented him from representing his client at the level the rules require, Respondent was obliged to seek substitute counsel for his client and transfer responsibility for the matter to him or her. As noted above, Respondent failed to do this, in defiance of an explicit order by the court. FF 21.

Respondent's Prior Discipline

51. Respondent received a letter of informal admonition from Bar Counsel in 2000 for inadequate recordkeeping related to irregularities in his law firm's escrow account. BX 87.

III. Conclusions of Law

A. Motions

Pursuant to Board Rule 7.16(a), we now turn to the parties' motions. For the reasons discussed herein, the Hearing Committee recommends that the Board deny Respondent's motion to dismiss. In addition, the Hearing Committee denies Respondent's motion to strike the testimony of Bar Counsel's expert witness, and Bar Counsel's motion to exclude Respondent's disability mitigation evidence. The Hearing Committee grants Respondent's motion to strike Bar Counsel's Exhibit 88.

1.    Respondent's Motion to Dismiss

On July 30, 2012, Respondent filed a Motion to Dismiss, arguing that Bar Counsel could not prove any Rule violations "as a matter of law" because Respondent's client had no legal right that could have been preserved. Bar Counsel argues in opposition that the merits of the client's case are irrelevant to the question of whether Respondent violated the Rules of Professional Conduct, and that Respondent's argument is based on the incorrect legal conclusion "that the standards for establishing legal malpractice are not only relevant but also essential to establishing violations of the Rules." Bar Counsel's Opposition to Respondent's Motion to Dismiss the Specification of Charges at 2-3.

Bar Counsel is correct. "While some of the issues and necessary evidence may overlap, malpractice actions and disciplinary cases differ." *In re Douglass*, Bar Docket No. 359-00 at 20 (H.C. Nov. 19, 2002), *recommendation adopted in relevant part*, 859 A.2d 1069 (D.C. 2004) (per curiam) (appended Board Report). Thus, "in order to establish a violation of Rules 1.1 or 1.3, Bar Counsel need not prove proximate cause or damage" as in a malpractice action. *Id.* The Hearing Committee recognizes that in *In re Yelverton*, the Court held that, at least in cases where the allegedly incompetent conduct was intended to benefit the client, Bar Counsel must prove that the alleged misconduct had at least the potential to harm the client. 105 A.2d 413, 423 (D.C. 2014). Here, even if the underlying claims lacked merit, there was the potential for harm to the client because the district court specifically warned that the client might be sanctioned if Respondent did not comply with the deadlines set forth in the case management plan, which he failed to do, thus exposing the client to potential harm. *See* FF 20.

The Committee therefore recommends that the Board deny Respondent's Motion to Dismiss. Bar Counsel is not required to prove legal malpractice or harm to the client to establish

Rule 1.1 or 1.3 violations. *See In re Robertson*, 612 A.2d 1236, 1241 (D.C. 1992) ("[A] disciplinary proceeding is an inappropriate forum for determining issues relevant to a client's damages resulting from attorney malpractice").

   2.   Respondent's Motions to Strike

On January 28, 2013, Respondent filed a motion to strike Bar Counsel's Exhibit 88, an order issued by a Superior Court Judge fining Respondent for an untimely court appearance. As Respondent's motion points out, this order was later vacated. Bar Counsel has not opposed Respondent's motion to strike Bar Counsel's Exhibit 88. The Hearing Committee recommends that the Board grant the motion to strike BX 88.

Also on January 28, 2013, Respondent filed a motion to strike the testimony of Bar Counsel's expert, Peter Grenier, Esquire, on the basis that he gave unsworn testimony that was personal opinion based on hindsight, and consisted merely of a recitation of a series of mistakes made during the course of litigation. Respondent argues that Mr. Grenier failed to establish the standard of care that applied to Respondent in the underlying civil case. Attached to Respondent's motion was a copy of the Court's order in *In re Ford*, No. 01-BG-783 (D.C. Apr. 18, 2002) (per curiam) (dismissing charges where the respondent's incompetent representation was not seriously deficient). Bar Counsel opposed the motion, contending that (1) Grenier testified "after having been duly sworn by the Chairman" (Tr. 255), (2) Grenier's expert report (BX 72) defines the standard of care for plaintiffs' personal injury lawyers in the District of Columbia, (3) Bar Counsel asserted at the hearing that Grenier was qualified to give opinions on the standard of care, without objection from Respondent (Tr. 255), and (4) Grenier gave unchallenged testimony as to the standard of care. *See* Tr. 413-14 (Grenier). Board Rule 11.3 permits the Committee to accept any "[e]vidence that is relevant, not privileged, and not merely

cumulative" and "determine the weight and significance to be accorded[.]" The Hearing Committee recommends that the Board deny Respondent's motion to strike Grenier's testimony because the testimony was relevant and not privileged or cumulative, taken after he was duly sworn by the Chair, Respondent's counsel did not object to Grenier being qualified to give his opinion on the standard of care, and Respondent's counsel did not object to Grenier's testimony or cross-examine him.

### 3. Bar Counsel's Motion to Exclude Evidence of Disability

On December 12, 2012, Bar Counsel moved to exclude evidence and testimony relating to Respondent's arm injury, on the grounds that it was irrelevant to the violations phase of these proceedings, and Respondent had failed to give the required notice under Board Rule 7.6(a) to assert disability in mitigation of sanction. Respondent's counsel opposed the motion on the grounds that Respondent did not seek to assert a disability claim under *In re Kersey*, 520 A.2d 321 (D.C. 1987), and Respondent's physical condition was factual information pertinent to the determination of whether Respondent's actions were seriously improper.

During the hearing, the Hearing Committee provisionally admitted the exhibits and testimony regarding Respondent's physical disability. Tr. 22-23. While not relevant to a determination of whether Respondent violated the Rules of Professional Conduct, such evidence may be considered in mitigation of sanction, even in the absence of a formal *Kersey* disability claim, if the respondent establishes the necessary causal connection. *See, e.g., In re Weiss*, 839 A.2d 670, 671 (D.C. 2003) (imposing three-year suspension with one year suspended in favor of two years' probation, where the Court considered in mitigation psychiatrists' testimony that the respondent's misconduct was "the result of a psychological need for security born of his father's depression-era fear of poverty"); *In re Douglass*, 745 A.2d 307, 307 (D.C. 2000) (per curiam)

(imposing a public censure after considering the death of the respondent's mother and son and his own medical problems at the time of the underlying misconduct in mitigation of sanction). The Hearing Committee recommends that the Board deny Bar Counsel's motion with respect to disability evidence because evidence of Respondent's physical condition at the time of the representation is relevant and not cumulative.

B.    Rules 1.1(a) and (b)

Rule 1.1 provides:

(a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

(b) A lawyer shall serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters.

In *In re Evans*, the Court explained that

To prove a violation [of Rule 1.1(a)], Bar Counsel must not only show that the attorney failed to apply his or her skill and knowledge, but that this failure constituted a serious deficiency in the representation. . . . The determination of what constitutes a "serious deficiency" is fact specific. It has generally been found in cases where the attorney makes an error that prejudices or could have prejudiced a client and the error was caused by a lack of competence. . . . Mere careless errors do not rise to the level of incompetence. 902 A.2d at 69-70 (citations omitted); *see also In re Ford*, 797 A2d 1231, 1231 (D.C. 2002) (per curiam) (Rule 1.1(a) violation requires proof of "serious deficiency" in attorney's competence).

902 A.2d 56, 69-70 (D.C. 2006) (per curiam) (appended Board Report). Although the Board referred to Rule 1.1(a) only, the "serious deficiency" requirement applies equally to 1.1(b). *See Yelverton*, 105 A.3d at 421-22. To prove a "serious deficiency," Bar Counsel must prove that the conduct "prejudices or could have prejudiced the client." *Id.* at 422.

With respect to Rule 1.1(a), Comment [5] to Rule 1.1 explains that competent legal representation

includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation and continuing attention to the needs of the representation to assure that there is no neglect of such needs. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more elaborate treatment than matters of lesser consequence.

Rule 1.1(b) is "better tailored [than Rule 1.1(a)] to address the situation in which a lawyer capable to handle a representation walks away from it for reasons unrelated to his competence in that area of practice." *In re Lewis*, 689 A.2d 561, 564 (D.C. 1997) (per curiam) (appended Board Report). With respect to Rule 1.1(b), a Hearing Committee may find a violation of the standard of care established through expert testimony or, without expert testimony when an attorney's "conduct is so obviously lacking that expert testimony showing what other lawyers generally would do is unnecessary." *In re Nwadike*, Bar Docket No. 371-00 at 28 (BPR July 30, 2004), *findings and recommendation adopted*, 905 A.2d 221, 227, 232 (D.C. 2006); *see In re Schlemmer*, Bar Docket Nos. 444-99 & 66-00 at 13 (BPR Dec. 27, 2002) (noting that Bar Counsel need not "necessarily produce evidence of practices of other attorneys in order to establish a Rule 1.1(b) violation").

The competency, skill, and care of an attorney under Rules 1.1(a) and (b) must be evaluated in terms of the representation required and provided in the particular matter at issue:

> Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation and continuing attention to the needs of the representation to assure that there is no neglect of such needs. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more elaborate treatment than matters of lesser consequence.

Rule 1.1, cmt. [5].

We find clear and convincing evidence that Respondent violated Rules 1.1(a) and (b) when he failed to:

- Correctly advise Anders' parents about their ability to recover damages for medical expenses they had paid. FF 10.

- Ascertain the identity of the entities that owned and operated the ski resort at the time of the accident. FF 5, 12, 25.

- Preserve evidence in possession of his clients, or hire an investigator to investigate Anders' accident. FF 6-7.

- Amend the complaint to include the proper defendants, once they were known. FF 12, 25, 37.

- Hire an investigator to investigate Anders' accident. FF 7.

- Conduct discovery to develop evidence to support a gross negligence claim. FF 30.

- Hire local counsel familiar with rules and practices in the Middle District of Pennsylvania. FF 8.

- Prepare Anders in advance of his deposition. FF 31.

- Request additional time to file the expert report after being informed that the report would be delayed. FF 32, 34.

- Produce a statement of material facts to counter the defendants' first motion for summary judgment. FF 35-36, 40.

- File a brief in support of his motion to amend the complaint, as required by court rules, causing the court to treat his motion as withdrawn. FF 38, 41.

- File a stand-alone brief in opposition to the defendants' third motion for summary judgment instead of incorporating another defendant's brief by reference, as required by court rules. FF 36.

- Transfer the case to substitute counsel if and when Respondent's alleged disability prevented him from competently representing his client. FF 21, 49.

These failures demonstrate a serious lack of competence and violate the applicable standard of care. Thus, we find clear and convincing evidence that Respondent violated Rules 1.1(a) and (b).

C.    Rules 1.3(a) and (c)

Rule 1.3(a) states that an attorney "shall represent a client zealously and diligently within the bounds of the law." "Neglect has been defined as indifference and a consistent failure to carry out the obligations that the lawyer has assumed to the client or a conscious disregard of the responsibilities owed to the client." *In re Wright*, 702 A.2d 1251, 1254 (D.C. 1997) (quoting *In re Reback*, 487 A.2d 235, 238 (D.C. 1985), *adopted in relevant part*, 513 A.2d 226 (D.C. 1986) (en banc) ("*Reback II*")). Rule 1.3(a) "does not require proof of intent, but only that the attorney has not taken action necessary to further the client's interests, whether or not legal prejudice arises from such inaction." *In re Bradley*, Bar Docket Nos. 2004-D240 & 2004-D302 at 17 (BPR July 31, 2012), *adopted in relevant part*, 70 A.3d 1189, 1191 (D.C. 2013) (per curiam).

Rule 1.3(c) provides that an attorney "shall act with reasonable promptness in representing a client." "Perhaps no professional shortcoming is more widely resented by clients than procrastination," and "in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed." Rule 1.3, cmt. [7]. The Court has held that failure to take action for a significant time to further a client's cause, whether or not prejudice to the client results, violates Rule 1.3(c). *In re Dietz*, 633 A.2d 850 (D.C. 1993).

We find clear and convincing evidence that Respondent violated Rules 1.3(a) and (c) when he failed to take the following actions:

- Preserve evidence in possession of his clients, or hire an investigator to investigate Anders' accident. FF 6-7.

- Appear for a case management telephone conference via telephone on May 27, 2004, the date set by the court after it granted Respondent's second request for a continuance. FF 14-17.

- Coordinate with defense counsel to produce a case management plan by the deadline. FF 19.

- Conduct discovery to develop evidence to support a gross negligence claim. FF 30.

- Request additional time to file his expert's report after being informed that the report would be delayed. FF 32, 34.

- Amend the compliant to include the proper defendants, when he was on notice of the identities of the proper defendants as early as 2004. FF 12, 25, 37.

Thus, we find clear and convincing evidence that Respondent violated Rules 1.3(a) and (c).

## IV. Sanction

The appropriate sanction is one that is necessary to protect the public and the courts, to maintain the integrity of the profession, and to deter Respondent and other attorneys from engaging in similar misconduct. *See In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013) (citing *In re Scanio*, 919 A.2d 1137, 1144 (D.C. 2007)). The sanction imposed must also be consistent with cases involving comparable misconduct. *See* D.C. Bar R. XI, § 9(h)(1); *In re Elgin*, 918 A.2d 362, 373 (D.C. 2007); *In re Berryman*, 764 A.2d 760, 766 (D.C. 2000). The determination of a disciplinary sanction takes into account: (1) the seriousness of the conduct at issue; (2) the prejudice, if any, to the client which resulted from the conduct; (3) whether the conduct involved dishonesty and/or misrepresentation; (4) the presence or absence of violations of other provisions of the disciplinary rules; (5) whether the attorney had a previous disciplinary history; (6) whether or not the attorney acknowledged his or her wrongful conduct; and (7) circumstances in mitigation of the misconduct. *See In re Vohra*, 68 A.3d 766, 784 (D.C. 2013) (citing *In re Hutchinson*, 534 A.2d 919, 924 (D.C. 1987) (en banc)). The Hearing Committee will address each of these factors in turn:

### 1. Seriousness of the Conduct

The conduct in this case involved pervasive, protracted neglect lasting over six years. Anders' case was dismissed as a result of Respondent's incompetence and neglect. Therefore, the seriousness of Respondent's conduct is a significant aggravating factor.

### 2. Prejudice to the Client

Respondent's actions caused his client to lose hope that he would prevail in his case and denied his client an opportunity for a decision on the merits. Thus, irrespective of the likelihood of prevailing on the claim, we find that Respondent's neglect prejudiced his client.

### 3. Dishonesty

Respondent made the following dishonest statements in his testimony at the hearing, which we consider in aggravation of sanction[4]:

- Respondent testified that he hired a private investigator, but could not remember the investigator's name, explain how the investigator was paid, or produce any documentary evidence to support this claim. *See* Tr. 137, 140-41, 224-25 (Respondent).

---

[4] Bar Counsel contends that Respondent testified falsely by stating that that a local rule of the Middle District of Pennsylvania required production of discovery without formal pleadings. *See* Tr. 164-69 (Respondent). Bar Counsel contends that the Middle District of Pennsylvania local rules do not support Respondent's claim; however, Local Rule 5.4(b) provides that "[i]nterrogatories, requests for disclosures, requests for documents, requests for admissions, and answers and responses thereto shall be served upon other counsel and parties but shall not be filed with the court except as authorized by a provision of the Federal Rules of Civil Procedure or upon an order of the court." We agree with Bar Counsel that Respondent's position is refuted by the local rules. However, we do not find that his testimony on this point was intentionally false.

Bar Counsel further contends that Respondent was dishonest in asserting in his Answer that Mr. Lien did not produce his expert on time "apparently because Anders and his parents apparently stopped paying the expert." BX H at 8. Respondent testified that Mr. Lien told him that he had not been paid. Tr. 239 (Respondent). This statement was supported by testimony indicating that the client had never been presented with a bill or informed that there was an outstanding balance. See Tr. 54-55 (Ellis), 114-15 (Anders). On balance, we find there is insufficient evidence that Respondent's Answer or testimony was intentionally dishonest.

31

- Respondent testified that the district court's November 16, 2004 order was his first notice that actions were required to be taken by November 17; however, the November 16 order states that it had already been given orally on November 10. *See* Tr. 197-99 (Respondent); BX 16.

- Respondent testified that he never took depositions of the defendants' witnesses because they never identified any witnesses, which is contradicted by several case management orders identifying witnesses, some of which were signed by Respondent. *Compare* Tr. 227-28 (Respondent), *with* BX 11 at 66; BX 15 at 101; BX 17 at 122; BX 75 at 12.

4.   Violations of Multiple Provisions of the Disciplinary Rules

As set forth above, Respondent violated four Rules of Professional Conduct: Rules 1.1(a), 1.1(b), 1.3(a), and 1.3(c). Although four is not an insignificant number of Rule violations, we do not consider it as an aggravating factor.

5.   Previous Disciplinary History

Respondent was issued an informal admonition on May 18, 2000 for failing to keep complete records of funds in his client trust account, in violation of Rule 1.15(b). BX 87. We consider this prior discipline as an aggravating factor.

6.   Failure to Acknowledge Wrongful Conduct

Respondent has neither acknowledged any wrongdoing nor shown any remorse for the consequences of his actions. At the hearing, he was argumentative, belligerent, and at times contemptuous of the charges. Respondent took no responsibility for his failure to do more on his client's behalf. Instead, he exaggerated the extent of his medical issues in an attempt to excuse his misconduct. Respondent's failure to recognize his misconduct is a significant aggravating factor.

7.   Mitigating Circumstances

Respondent contends that evidence of disability should be considered in mitigation. Specifically, Respondent suffered a broken arm in April 2004. FF 47. Respondent claimed that

this injury left him unable to work until December 2005; however, he continued to represent clients in D.C. Superior Court during this period of time. FF 47. His neglect and incompetence began prior to his injury and endured after he claimed to have recovered. *E.g.*, FF 5, 37. Although his first request to withdraw and substitute counsel was denied, the court later reversed course and directed Respondent to transfer responsibility for the case, but Respondent missed the court-ordered deadline to substitute counsel. FF 21. There is no evidence that Respondent's injury caused any of his misconduct in this case. Therefore, we do not consider Respondent's evidence of disability in mitigation of sanction.

Here, Bar Counsel recommends a three-month suspension on the grounds that Respondent has previously been disciplined, he exhibited a pattern of neglect throughout the representation spanning six years, and finally, that Respondent provided inaccurate statements in his Answer and misled the Hearing Committee with false testimony. Bar Counsel argues that this case involves aggravating factors, such as a pattern of neglect and prior discipline history, which warrant the imposition of suspension. Respondent's post-hearing brief does not address a recommended sanction.

Sanctions in cases involving incompetence, neglect, and prior discipline range from 30-day to six-month suspensions. *See, e.g., In re Mance*, 869 A.2d 339, 341 (D.C. 2005) (per curiam) (30-day suspension stayed in favor of one year of probation for violating Rules 1.1(a) and (b), 1.3(a) and (b), 1.4(a), 1.16(a)(3), and 8.4(d) where the respondent had received two informal admonitions for violating Rule 1.5(b)); *In re Douglass*, 859 A.2d at 1086 (appended Board Report) (90-day suspension for violating Rules 1.1(a) and (b), 1.3(a) and (c), and 1.8(a), where the respondent had been informally admonished and publicly censured "on a number of occasions" for neglect); *In re Drew*, 693 A.2d 1127, 1128 (D.C. 1997) (per curiam) (60-day

suspension for violating Rules 1.1(a) and (b), 1.3(a), 1.3(b)(1), 1.16(d), and 8.4(d) in two cases, where the respondent had received three informal admonitions for similar misconduct); *In re Knox*, 441 A.2d 265, 268 (D.C. 1982) (three-month suspension for neglect, intentional neglect, and intentional prejudice, where the respondent had received an informal admonition for similar misconduct). Similar sanctions have been imposed for neglect and incompetence coupled with other aggravating factors. *See, e.g.*, *In re Askew*, 96 A.3d 52 (D.C. 2014) (six-month suspension with all but 60 days suspended in favor of one year of probation for violations of Rules 1.1(a) and (b), 1.3(a), 1.4(a), 1.4(b), 1.16(d), 3.4(c), and 8.4(d), where the respondent admitted to "egregious neglect" in one Criminal Justice Act case as a result of her failure to adequately organize her practice); *In re Chapman*, 962 A.2d 922, 926-27 (D.C. 2009) (per curiam) (60-day suspension, with 30 days stayed in favor of one year of probation and CLE for violating Rules 1.1(a) and (b) and 1.3(a), where the respondent engaged in deliberate dishonesty toward the disciplinary system); *In re Bernstein*, 707 A.2d 371, 377 (D.C. 1998) (30-day suspension for violating Rules 1.3(a) and (c), 1.4(a) and (b), and 1.16(d), where the neglect lasted over three years).

In light of the above analysis, the Hearing Committee recommends that Respondent receive a sanction of a six-month suspension. Respondent engaged in a pattern of neglect that caused his client's complaint to be dismissed twice. He consistently failed to meet deadlines, and failed to amend the complaint after he was notified—twice—that he had named the wrong defendants. Perhaps more egregiously, he conducted little or no discovery in the case.

We recognize that six months' suspension is at the higher range of sanctions in similar cases. We find that it is justified by Respondent's refusal to accept any responsibility for his actions. His failure to acknowledge any wrongdoing, his evasiveness and at times, belligerence

and his dishonest testimony are significant aggravating factors that warrant a lengthy suspension. *Bradley*, 70 A.3d at 1195 (false testimony before the Hearing Committee is a significant aggravating factor); *Chapman*, 962 A.2d at 927 ("[d]eliberately dishonest testimony receives great weight in sanctioning determinations"). We note that *In re Askew*, Respondent received a six-month suspension despite having admitted to "egregious neglect." In contrast, Respondent disclaimed any neglect. A sanction at least as severe as that imposed in *Askew* is therefore appropriate.

## V.    Conclusion

For the foregoing reasons, the Hearing Committee finds that Respondent violated Rules 1.1(a), 1.1(b), 1.3(a) and 1.3(c), and recommends that he be suspended from the practice of law for a period of six months.

AD HOC HEARING COMMITTEE

Laura S. Shores, Chair

David Bernstein, Public Member

Lucy Pittman, Attorney Member

Dated:    JUN - 8 2015

35